[Crim. No. 2357. Second Appellate District, Division One.—June 9, 1933.]

THE PEOPLE, Respondent, v. ALBERT C. O'BRYAN, Appellant.

W. C. Dalzell for Appellant.

U. S. Webb, Attorney-General, and Siebert L. Sefton for Respondent.

DESMOND, J., *pro tem.*—Defendant was found guilty by a jury of the crime of attempt to commit incest and sentenced to San Quentin state prison. He appeals from the judgment and from an order denying his motion for a new trial.

One John Wilemon testified that, armed with a revolver, he had secreted himself in a bedroom closet at the home of defendant's daughter Anna, a married woman, referred to occasionally hereinafter as Mrs. N——; that he entered the closet upon his observing the defendant come up the walk toward the front porch of Mrs. N——'s home about 7 o'clock of the evening of August 17, 1932, while he and Mrs. N—— were alone in the house, Mrs. N——'s husband having gone to work a few hours previously; that shortly after defendant's arrival at Mrs. N——'s house, this witness surprised him in the act of attempting to have sexual intercourse with Mrs. N——, his own daughter, against her objection, the witness describing in detail the position in which he found the defendant and Mrs. N—— on the bed as he opened the closet door, the revolver grasped in his right hand. The defendant claimed in his testimony that he was the victim of a "frame-up", that his intention in going to the bedroom with his daughter was at her request to examine the wound left in her side by a recent operation, which the daughter complained had not been a complete success, the defendant having had some experience with wounds and operations during a period of twelve to fourteen years while serving as a nurse or orderly in the hospital at Soldiers' Home, Sawtelle. Defendant testified that his daughter, after he had visited her that same afternoon,

had followed him to his automobile as he was leaving for home and asked him for $200 to lift the burden of debt weighing upon herself and her husband, suggesting that defendant could easily borrow $1500; that he said he could not give her the amount desired, but would consider the request for assistance and would return that night, if possible, with some money to meet current pressing needs; that Wilemon was in Mrs. N——'s house at the time he had this conversation by the street curb, but the daughter's husband had gone to work shortly after defendant arrived that afternoon. Defendant further testified that when he returned that same evening he had $9 which he intended to give to his daughter; that the latter persuaded him to stay a little while and when he entered the bedroom for the purpose of examining Mrs. N——'s wound, Wilemon and the daughter together disrobed him, the former taking off his trousers, the latter his shoes, while Wilemon kept him covered with the gun; Wilemon, on the other hand, testifying that when he opened the closet door and pointed the gun at defendant, he was already undressed, except as to underwear and socks. It is undisputed that defendant was kept thus disrobed and under the threat of the revolver for some two or three hours in the bedroom, and that in the meantime two men who were summoned by the daughter by telephone came in and saw him while he was in that condition; that about 10 P. M. defendant was permitted to return to his home, where his wife (not the mother of Mrs. N.——) was ill, Mrs. N—— driving him there, defendant sitting in the auto seat between her and Wilemon; that the two men who had been called to her house by Mrs. N—— followed in another auto; that defendant refused to leave his own home when requested to return to the daughter's house by Wilemon, and later at about 11 P. M. was arrested, having gone to bed after the escorting party had left this house. Defendant testified that while he was held en deshabille in the bedroom of his daughter's house, Wilemon demanded that he pay the sum of $1500 to the daughter and himself, saying he was to receive $500 of that amount; he also testified that his daughter had urged him, after she had talked with Wilemon in the adjoining hallway, to meet the latter's demands, and indicated by his testimony that the daughter was forced to play her part in the drama

through some dominance acquired over her previously by Wilemon, the defendant stating that he did not blame his daughter for what was done. It may be noted here that defendant and the mother of Mrs. N—— had been divorced many years previously when Mrs. N—— was a very young child, and that thereafter Mrs. N—— made her home, until her marriage, with her mother, not with defendant. Meantime the mother of Mrs. N—— and the defendant married other spouses. Wilemon swore that when he caught the defendant *in flagrante delicto*, the latter offered him $1,000 for his freedom and later increased the amount by $500, but all offers were refused, the witness preferring to hold defendant until the daughter's husband should "settle" with him.

Wilemon testified over strenuous and repeated objections that after leaving O'Bryan's home, he drove the daughter to the police station and that the daughter there complained to Officer Whitehead concerning her treatment at the hands of defendant. The record reads as follows:

"Q. By Mr. Ferguson (Deputy Dist. Atty.): You testified that you came out to the car from O'Bryan's home and found Mrs. N—— at the car? A. Yes, sir. Q. Did you go anywhere with Mrs. N—— at that time? Mr. Dalzell: Just a minute; to that we object as incompetent, irrelevant and immaterial. This is after the offense alleged and anything that is done by Mr. Wilemon or Mr. N—— (undoubtedly this should be Mrs. N——) outside of the presence of the defendant is absolutely immaterial, has nothing to do with any of the issues in this case. The Court: Let me have the question and answer again. (Question and answer read by the reporter.) The Court: Objection overruled. Q. By Mr. Ferguson: Did you, Mr. Wilemon? A. I went to the police station in Sawtelle. Q. Directly from O'Bryan's home? A. Yes, sir. Q. About what time did you arrive at the police station? Mr. Dalzell: May it be understood, your Honor, we are making the same objection to all these questions? The Court: Yes. A. Around 11 o'clock; it was something like that. Mr. Ferguson: May the answer be repeated by the reporter? (Answer read by the reporter.) Q. That station, you say, was the West Los Angeles Police Station? A. Yes, sir. Q. Upon arrival there, who did you see? A. I asked for an officer, and I think—

Q. Just who did you see, Mr. Wilemon? A. I seen Mr. Whitehead and Mr. Davis. Q. This is Mr. Whitehead, the man to whom you refer? A. That is one of the gentlemen, yes. Q. Now, did you and Anna N—— talk to those two officers at that time? Mr. Dalzell: The same objection, your Honor. A. She did. The Court: The same ruling. Q. By Mr. Ferguson: At that time and place did Anna N—— make a complaint to Mr. Whitehead and Mr. Davis, the two officers you have mentioned? Mr. Dalzell: Just a minute. We object to that— The Court: You may answer that 'yes' or 'no'. Mr. Dalzell: Just a minute. A. Yes. Mr. Dalzell: I wish to assign counsel's asking of the question as misconduct. The Court: Objection overruled. Q. By Mr. Ferguson: Was that complaint concerning lewd and lascivious conduct upon her committed by the defendant O'Bryan? Mr. Dalzell: To that we object as incompetent, irrelevant and immaterial, and an attempt to get hearsay into the record by an indirect method. The Court: You may answer the question 'yes' or 'no'. Objection overruled. A. Yes. Mr. Dalzell: We assign the asking of the question as misconduct. The Court: You may proceed. Q. By Mr. Ferguson: How long did you and Anna N—— remain at the police station? A. Until about 1 o'clock, I should judge. Something like that. Q. That would be 1 o'clock on the morning of the 18th? A. In the morning, yes. Q. Do you recall now the day of the week the 17th was on? A. The best I can remember it was on a Thursday.''

Officer Whitehead's testimony on direct examination was as follows: ''By Mr. Ferguson: Q. Mr. Whitehead, you are a Detective Lieutenant of the Los Angeles City Police Force, are you not? A. I am. Q. On the 17th day of August of this year, where were you working? A. At West Los Angeles Division. Q. Where is the station of that division located? A. Located at 1653 Perdue Avenue, West Los Angeles. Q. On the night of August 17th of this year did you see a person who has been described at this case as Anna N——? A. I did. Q. Where were you when you first saw her? A. In the police station. Q. Was that the first time, to your knowledge, that you had ever seen the woman? A. Yes, sir. Q. What time did you say that was about? A. Approximately 10:30 p. m. Q. Was there any-

one present with you at the time you first saw Mrs. N——?
A. Mr. Wilemon. Q. Anyone else? A. Not at the first
.time. Shortly thereafter I called Mr. Davis, my partner at
that time. Q. Did Mr. Wilemon and Mrs. N—— come into
the police station? A. They did. Q. You saw them in one
of the rooms of the police station? A. I did. Q. At that
time and place did Anna N—— make a complaint to you
concerning a lascivious attack committed upon her by her
father, O'Bryan, the defendant in this case? Mr. Dalzell:
Just a minute. We object to that as incompetent, irrele-
vant and immaterial, hearsay, a statement not in the pres-
ence of this defendant. The Court: Objection overruled.
You may answer 'yes' or 'no'. A. Yes, sir. Mr. Fergu-
son: Cross-examine. Mr. Dalzell: No questions.''

Wilemon was permitted to testify, over defendant's objec-
tion, to a conversation between defendant and his daughter
in the early morning of August 8th, after the defend-
ant had spent the night at the home of his daughter, occu-
pying the bedroom in which he was apprehended ten days
later. Wilemon testified that during the preceding night
he and the daughter had occupied the living-room of the
house, he sleeping on a duofold and Mrs. N—— on a day
bed. As to this testimony the record reads as follows:

''Q. By Mr. Ferguson: Did you have any discussion with
O'Bryan concerning him staying there that night? A.
Yes, I offered to take him home. Q. And what did he say?
A. He first said that he would let me take him home, and
then he backed out; he wouldn't go. Q. Did he say any-
thing else? A. He said he would go to bed back there, and
he did, went to bed in Mrs. N——'s bedroom. Q. What bed
did he occupy? A. The bed in the back bedroom. Q. That
is the same bedroom, of course, that you have previously
testified about? A. Yes, sir, it is. Q. Did you hear any
conversation between O'Bryan and Mrs. N—— the night of
the 7th? Mr. Dalzell: I object to that as incompetent, ir-
relevant and immaterial, and that it cannot have any bear-
ing on any issue in this case. Mr. Ferguson: I think that
it will have, your Honor. I would be glad to state my pur-
pose if we may approach the bench. The Court: I think
you had better. I do not see the point at the present time.
(The following proceedings were had at the Judge's bench,
out of hearing of the jury): Mr. Ferguson: I expect the

witness to testify in response to the pending question that on the night of the 7th, the defendant in this case offered Anna N—— $90.00 to go back in the bedroom with him, and perhaps additions to that, which additions are matters which would suggest a proffered act of sexual intercourse. Mr. Dalzell: I object to that, Mr. Ferguson. The witness could hear what you were saying. The Court: Perhaps we should be more careful and not make any further offers of proof up at the bench. Mr. Ferguson: Well, I suggest that your Honor ask the witness if he heard what I said, and if he did, I will withdraw the question. The Court: Did you hear any part of what we were discussing, Mr. Wilemon? The Witness: I was not paying any attention to you, Judge, at all. Mr. Dalzell: I insist upon my objection. The Court: The objection is overruled. (The following proceedings were had in the presence and hearing of the jury): Mr. Ferguson: Will you read the question, Mr. Reporter? (Question read by the reporter as follows: 'Q. Did you hear any conversation between O'Bryan and Mrs. N—— the night of the 7th?') A. Well, I heard a conversation about 6 o'clock in the morning. I didn't hear any during the night. Q. Would that be the morning of the 8th? A. Yes, it would be the morning of the 8th. Q. Where were you when you heard that conversation? A. I was laying on the duofold. Q. Where was Anna N——? A. She was over by the kitchen door, the best I remember. I wouldn't say positively she was by the kitchen door, but she was there in the room. Q. And could you tell where the defendant O'Bryan was? A. He was in the front room. I was laying with my face to the wall, and my back towards where they were at. Q. How close were they together, that is, O'Bryan and Anna N——, at that time? A. I didn't see them; I just heard them talk. Q. And what did you hear on that occasion? A. I heard him tell her that he had $90.00 for her if she would have come back when he called that night. He said, 'You know when I called you back I had $90.00 for you if you come back there, but I guess you were afraid of your cowboy friend.' ''

Wilemon had previously testified that he was a rodeo entertainer, and presumably could be classed as a cowboy, although that had not been his sole occupation. After Wilemon had given the testimony last quoted, he was asked

under cross-examination if he had ever mentioned this conversation of August 8th between defendant and his daughter in any of the proceedings in this cause, there having been two former trials in which the jury had failed to bring in a verdict. This question the witness was not permitted to answer, the district attorney objecting on the ground of immateriality. Later, the defendant gave his own version of the incident, denying any such conversation, but saying that in the early morning of August 8th he had gone into the living-room to get his keys and found Wilemon and Mrs. N—— occupying the same bed. On cross-examination defendant was asked if this occasion was not the first on which he told what he had seen on this morning of August 8th. Objection was made on the ground that the inquiry was incompetent, irrelevant and immaterial, but the objection was overruled, the defendant required to answer and did so, in the affirmative.

Appellant claims on this appeal that all the quoted testimony relative, first, to the complaint, second, to the conversation of August 8th, was improperly admitted. We proceed, therefore, immediately to a discussion of this contention. ■ We think it may be fairly stated as the general rule that evidence as to the complaints of an outraged woman may be admitted only as corroborating or sustaining her testimony, and that when she does not appear as a witness, even the fact that she made complaint, however recently after the injury, is not admissible. There is an exception to this rule in the case of a child too young to testify, the courts holding that testimony as to the complaint in such case and under certain circumstances may be given by the person to whom complaint is made. (*People* v. *Figueroa*, 134 Cal. 159, 162 [66 Pac. 202]; *People* v. *Bianchino*, 5 Cal. App. 633, 636 [91 Pac. 112].) We know of no other exception. ■ Whether the alleged victim of the assault in this case would have testified that she made complaint to the police officers we shall never know, because she died before the case first came to trial. Having in mind the fact that testimony of a complaint made as soon as possible after an attack is admissible in the case of an adult victim of rape to demonstrate the fact that the act was committed against her will, and knowing that instead of making an immediate complaint the woman alleged to have been injured

in this case did not telephone the police or go to the police station, if at all, until approximately four hours after the time of the offense charged, and then only after defendant had refused to go back to her house at the point of Wilemon's gun there to settle with her husband we seriously doubt whether the admission of her own testimony on these points would have been justified. If it be urged that she is dead and cannot testify, and therefore that the testimony of Wilemon and the police officers was properly admitted as in the case of a child unable to testify, then we must rule against that contention, a compelling reason being furnished by the nature of the inquiries made by the district attorney and the answers thereto. We need only quote here the well-known rules set out in 22 California Jurisprudence, page 385: "Particulars of Complaint.—While the fact of complaint is admissible in evidence, the particulars or details thereof may not be shown. Any statement as to the name of the perpetrator by the prosecutrix is, therefore, inadmissible, unless made merely to identify the complaint and not for the purpose of disclosing the guilty party." In addition to cases there cited, see, also, *People* v. *Avila,* 50 Cal. App. 228, 230 [194 Pac. 768, 769], where it is said "the true rule is to admit evidence of the fact of complaint in all cases, and in no case to admit anything more. The evidence, when restricted to this extent, is not hearsay, but in the strictest sense original evidence. When, however, these limits are exceeded, it becomes hearsay in a very objectionable form. There is every reason therefore why it should be admitted to the extent indicated, and none why it should be admitted further.". (Citing *People* v. *Mayes,* 66 Cal. 597 [6 Pac. 691, 56 Am. Rep. 126]; 3 Greenleaf on Evidence, sec. 213.)

As in the Avila case, where evidence over defendant's objection was adduced from the officer who arrested defendant, we must say here that the court in ruling that such evidence was admissible committed prejudicial error. As to the testimony given by Wilemon over objections of the defendant, regarding a conversation which he says he overheard between defendant and Mrs. N—— on the morning of August 8th, we feel that it was improperly admitted. Conversation is not a crime, nor is it an attempt to commit a crime. To constitute an attempt there must be *an act*

*done* with the intention of committing a crime tending to but falling short of the act intended. (7 Cal. Jur., p. 875.) (See discussion of this subject by Field, C. J., in *People* v. *Murray*, 14 Cal. 159, where defendant was indicted for an attempt to contract an incestuous marriage.) As is said in *Ex parte Floyd*, 7 Cal. App. 588, 590 [95 Pac. 175, 176], "Mere soliciting one to commit an act which would constitute a crime if committed is not made criminal by our Penal Code."

We are familiar with the rule invoked by respondent to support the admission of the testimony complained of, namely, that evidence of similar offenses between the same parties may be introduced for specific and limited purposes, in prosecutions involving sexual crimes. But neither the events nor conversation of August 7th and the early morning of August 8th constituted an offense of any sort, similar or otherwise. Whether evidence relating to them was introduced at the first or second trial, we do not know, but such evidence, if believed by the jury in this case, of course, worked serious prejudice to the defendant, perhaps just enough to enable this third jury to find defendant guilty. We have read the entire transcript in this case and have considered other points urged by appellant; however, find it unnecessary to discuss them, since on the matters already referred to, his position on this appeal must be sustained.

Judgment and order reversed.

Houser, Acting P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 24, 1933, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 7, 1933.