[Crim. No. 3544. Second Dist., Div. Three. Aug. 14, 1942.]

THE PEOPLE, Respondent, v. GEORGE S. HUBBELL, Appellant.

Morris Lavine for Appellant.

Earl Warren, Attorney General, and R. S. McLaughlin, Deputy Attorney General, for Respondent.

SHINN, J.—Defendant was convicted by verdict of a jury of two counts of violation of section 288 and one count of violation of section 288a of the Penal Code. The offense involved in count I of the information was alleged to have been committed in July, 1938, upon the person of a female child nine years of age, while she was seated upon defendant's lap in his home and upon an occasion when other young children were present and being entertained by defendant with stories, which form of entertainment frequently brought neighborhood children to defendant's home. The offense involved in count II was alleged to have been committed in the defendant's home upon the person of a thirteen-year-old boy, consisting of a violation of section 288 on March 24, 1940, and the third involving a violation of section 288a on December 12, 1940, with the same boy. The information was filed February 11, 1941, and the trial was commenced September 30, 1941. Defendant appeals from the judgment as to each count and from an order denying his motion for a new trial.

Appellant's first contention is that the evidence was insufficient to support a conviction of any of the offenses charged. The acts testified to in two instances clearly came within the purview of section 288 and in the other instance of section 288a of the Penal Code. Appellant's argument is that the stories of the children were confused, contradictory, and unworthy of belief. While there were conspicuous weaknesses in the testimony, which we shall point out, the contention that the evidence is insufficient to support the verdicts is not sustainable as to any of the three counts.

We should preface our discussion of the conviction under the first count by saying that while we think it was not legally insufficient to support the verdict of guilty, we consider the evidence of guilt to be palpably weak. The proof of the crime was so inconclusive as to lead us to believe that the defendant probably would not have been convicted under this count except for certain errors occurring at the trial in the receipt of evidence and instruction of the jury, which call for a reversal.

The trial took place more than three years after the date of the offense as alleged in count I. The prosecutrix, whom we shall designate as Jane Doe, lived in defendant's neighborhood, was acquainted with defendant's young daughter who lived with him part of the time, and she frequently came to defendant's home with other young children. There was a sharp conflict in the evidence as to whether Jane ever was in defendant's home after the summer of 1937. She had no definite recollection as to the year in which the alleged offense occurred, but the evidence of all of the witnesses who testified on the subject was to the effect that she never returned to the defendant's home after either the summer of 1937 or 1938. The testimony of defendant and his witnesses that she had not been in his home after the summer of 1937 was definite and was supported by circumstances strongly tending to establish that fact. The child's mother testified to a complaint made by the child to her concerning the defendant in July of 1938 and which she said was about a week after the date of the alleged incident, as the time of the occurrence was related to her by her daughter. We shall assume that this evidence, which stands alone, was sufficient to support the finding of the jury that the offense charged in count I was not committed more than three years prior to the filing of the information.

The testimony of the prosecutrix was to the effect that she was in defendant's home with five or six other children one afternoon during the summer school vacation; that she was seated on defendant's lap while he was telling a story, which he was "acting out with his hands"; that during the telling of the story he touched her private parts once but did not rub them, the plain import of her testimony, in which the circumstance was related several times, being to the effect that the contact of defendant's hand with her body was at most but momentary. While it was a procedure

not unusual in such cases, the child's story was elicited by leading questions. Practically all of the facts relating to the occurrence had completely left the mind of the prosecutrix. She could not recall how she was seated in defendant's lap, whether she was moved from one knee to the other, the names of any of the children who were present, where or how they were seated, and in response to the court's questions could not recall whether the panties she had on were tight or loose fitting, nor how much of her legs they covered, or anything else about them. She could not recall at what point in the story being told by defendant the incident occurred, although she testified that she remained on his lap until the story was finished. She recalled going to her home afterward but could not recall whether her mother was present when she arrived. In similar respects her testimony made it clear that she had but an indistinct recollection of what had taken place at the time, the sole specific fact that she was able to recall being that the defendant in some manner had placed his hand upon her private parts beneath her clothing. She was not injured in any manner and there was no evidence that she had been startled or frightened by the experience, nor was there anything in her testimony to suggest that the alleged conduct of defendant had made a firm impression upon her mind. It is not surprising that the child was unable to testify with greater certainty as to the identity of the children who were present and as to the other attendant circumstances. It would have been unusual if such matters had not passed from her mind after the elapse of more than three years but it is nevertheless true that her recollection was uncertain as to the manner in which the alleged offense was committed and as to details bearing directly upon the question of criminal intent. Under these circumstances, where the evidence that a crime was committed consists of the uncertain testimony of a young child, given more than three years after the date of the alleged offense, it is our duty to give critical attention to all of the rulings of the court during the trial and to the manner in which the jury was instructed, in order to satisfy our minds whether errors were committed that were prejudicial to the rights of the defendant.

The mother of the prosecutrix testified, over objection of defendant, that a week or two after her daughter had made complaint to her she made a report to the police at the

police station. No testimony was given as to any conversation she had upon that occasion, although she did testify that she did not, following that report, appear in court as a witness against defendant. The clear inference from the testimony was that a report had been made as to an alleged act of misconduct of defendant but that it had not been made the subject of a criminal charge. Evidence that the mother complained to the police some three weeks after the alleged commission of the offense was not admissible for any purpose. Its effect upon the minds of the jury, we think, would have been to strengthen the mother's testimony to the effect that the child had complained to her and the evidence carried the implication that the mother, at least, believed that the defendant was guilty of some offense against her daughter. We are aware of no rule of evidence which permits a party to prove the acts of his witness, otherwise inadmissible, for the sole purpose of giving circumstantial support to the truth of the recitals he has given on the stand and to thus bolster his testimony. Certainly the evidence was not admissible under the rule which permits proof of complaints made by minors and others contemporaneously with or within a short time after the commission of offenses of violence against them, and we think it was not admissible upon any tenable theory. The mother was permitted to testify further, over objection, that she had also talked with a police officer, who was a witness in the case, in January, 1941, when he came to her house, the natural inference being that they discussed the occurrence as to which the previous complaint had been made. It is not at all unreasonable to believe that this evidence would have tended strongly to convince the jury that defendant must have been guilty of misconduct of some sort, as otherwise the complaints to the police would not have been made. Unsanctioned by any rule of evidence, the complaints made by the mother, with the implications naturally flowing therefrom, were hearsay and under the facts of the present case were prejudicial to defendant.

 The court instructed the jury as follows: ''Proof of the corpus delicti means proof of the essential elements necessary to constitute the crime charged and of the existence of criminal agency or means as the cause of them. It may be proven by circumstances shown in evidence, or by inference drawn from facts proven. The evidence of the corpus

delicti need not be of conclusive character, and need not necessarily connect the party informed against with the commission of the crime, in order to justify the consideration of an admission or confession of such party so charged with the crime. It is not necessary that the corpus delicti should be proved beyond a reasonable doubt before proof may be made of an admission or confession. Prima facie evidence of the corpus delicti is sufficient; and it is for the court to say whether there is sufficient evidence of the corpus delicti to go to the jury, precisely as in the case of any other material fact.''

It is contended that this instruction was confusing; that it was susceptible of a construction that prima facie evidence alone was required to establish the elements of the offense, that the court had determined that the proof of the crime aside from any confession of the defendant was sufficient to meet the requirements of the law and that the jury must abide by that decision. This criticism is well founded. The rule of law stated in the instruction is exclusively one for the guidance of the court during the trial. It is the duty of the court in the first instance to pass upon the sufficiency of the proof of the corpus delicti before admitting a confession or admission of the defendant, but that is a matter with which the jury is not concerned. There could be no proper occasion for the giving of the quoted instruction and the jury inevitably must have been confused in its endeavor to apply the rule stated to their own duties, since any attempt to do so would have led them astray. We think the instruction as given was susceptible of a construction by the jury that they were obliged to accept the decision of the court as to the sufficiency of such evidence. Necessarily the jury would have believed that the instruction was given for their guidance but we think it would have been impossible for them to have found such guidance in the statement of a rule which has application only to questions of the admissibility of evidence. That the instruction was seriously prejudicial to defendant in view of the unsatisfactory proof of guilt under count I cannot be doubted.

In the cross-examination of a police officer, he was questioned by the defendant concerning testimony he had given at the preliminary examination in which he related a conversation he had had with defendant, and his testimony was

read, as follows: "A. Well, I asked him if he knew who made the complaint against him whereby he was brought before the authorities at the University, and he said he had a good idea who it was. I asked him if he knew who it was and he said, 'I suspect it was [John Doe, the prosecuting witness].' I asked him if he had ever fondled [John Doe], and he said, 'Well, not intentionally, but maybe psychologically he had, but he didn't mean to harm the boy intentionally'." Upon redirect examination, over objection of defendant, the district attorney read at length from the testimony of the witness given at the preliminary, the testimony so read relating but briefly to the matter inquired about on cross-examination, as we have quoted it, but extensively to defendant's alleged statements to the officer relating to many other matters, and containing statements strongly indicating, if not admitting, guilt. These passages from the testimony were read over the repeated objections of defendant and upon the insistence of the district attorney that he had a right to read them because they were all contained in a single answer of the witness to a question propounded at the preliminary and because he contended that they tended to clarify the testimony of the witness with respect to the single matter which we have already alluded to elicited upon his cross-examination at the trial. It is apparent that the purpose of the district attorney was not merely to clarify the testimony of the witness in the particular in question, which required only the reading of a single sentence, but to read as much as the court would allow of the other damaging statements of defendant that had been testified to by the witness at the preliminary. The witness had related his recollection of the same conversation in his direct examination at the trial, concluding with the statement, "I think that about covers it," he had been cross-examined as to the same conversation and yet the district attorney, not by questions properly propounded, but by reading from the preliminary transcript, supplemented the testimony of the witness, after he had testified at length, and this, as we shall point out, in defiance of the rulings of the court. At one point the court struck out a portion of the testimony read and instructed the jury to disregard it and soon thereafter stated, "I think perhaps, as it is very lengthy, it has gone far enough." The defense made a motion to strike out additional portions, which motion was granted by the court. The district attorney continued

reading testimony having no relation whatever to the cross-examination and containing further damaging admissions of defendant, whereupon defendant made another motion to strike more of the testimony, and the court said, "I think the motion to strike will be granted, and you had better abstain from reading all that balance. . . . It covers a multitude of subjects and it has drifted away from the original purport of that portion defense counsel referred to in their cross-examination. . . . That portion is down to the time when the court granted the first motion to strike, and from there on the motion to strike is granted and it is stricken." The district attorney continued with his reading along the same lines, elicited from the witness that he had so testified at the preliminary, and finally offered the original transcript of the testimony of the witness at the preliminary hearing covering his entire direct and cross-examination. In this manner the district attorney contumaciously ignored the adverse rulings of the court and placed before the jury former testimony of the witness, which was not admissible under the circumstances. The offer of the entire testimony of the witness given at the preliminary, without reason to believe that it would or should be received in evidence, carried the imputation that there was other testimony of like damaging character. Defendant repeatedly assigned the conduct of the district attorney as prejudicial misconduct, and the court, in denying the assignments, admonished the jury to disregard the import of the offer of proof as thus made. The conduct persisted in by the district attorney was wholly lacking in fairness to defendant and in respect for the court's rulings.

We are of the opinion that the conduct was prejudicial to defendant. Some of the testimony as thus read had been stated in substance in the direct or cross-examination of the witness upon the trial, but statements in addition to the facts previously testified to were placed before the jury only by the reading of the testimony by the district attorney. One of these statements was to the effect that defendant had stated that he and a young boy, brother of the male prosecuting witness, had stripped and taken showers together and that he saw nothing wrong in that; another was that John Doe had placed his, defendant's, hand upon his, John Doe's, naked skin and that this had given defendant sex gratification; another statement of defendant related in the testi-

mony at the preliminary was that he had fondled the prosecutrix Jane Doe in his home but did not know when it was; a further statement was that he had had another female child in his lap on a bus and had received sex gratification from placing his hand upon her stomach. Also included in the testimony read was an alleged statement of defendant that he had known for a long time that he was a sex pervert and a statement concerning the soiling of his clothes as a consequence of sex activity when fondling children. Other statements read from the testimony, while corresponding generally with the testimony of the witness at the trial, were yet more specific and damaging.

The several rulings of the court striking out portions of the testimony, and the admonition respecting the prosecution's offer of the entire testimony of the witness at the preliminary could not repair the damage that had been done. Nor is it an answer to the charge of unfair conduct on the part of the district attorney that some of the testimony read was mere repetition of testimony given by the witness at the trial nor that defendant made a statement in writing, which we shall refer to later, containing damaging admissions of somewhat similar import. Mere rulings striking out testimony or admonitions to pay no attention to it cannot remove the feelings of revulsion and abhorrence that are occasioned by narrations that shock the senses and arouse resentment toward the accused. The harm that comes from the needless and unwarranted repetition of such inculpatory statements, as well as from damaging statements improperly placed before the jury, is, of course, greatly magnified in a case where the evidence of guilt is conspicuously weak, as it was under count I.

In view of the conflict in the evidence whether Jane Doe had ever been in his home after the summer of 1937, it was of extreme importance to defendant that the jury should have had a clear understanding of the statute of limitations as applicable to the offense charged in the first count. An instruction was requested and refused by the court, which stated the law concisely and clearly and the following instruction was given at the request of the People: "An alibi simply means that the defendant was at another place at the time the crime charged is alleged to have been committed. All the evidence should be carefully considered by you, and, if the evidence on the subject, with reference to any particu-

lar count in the information, considered with all the other evidence, is sufficient to raise a reasonable doubt as to the guilt of the defendant on that particular count, you should acquit him. It is sufficient to justify an acquittal if the evidence upon that point raises a reasonable doubt of his presence at the time and place of the commission of the crime charged, if you find that a crime was committed.

"The Court further instructs the jury that although as to each count in the information it is alleged that they were committed 'on or about' a particular date, that it is wholly immaterial on what day or night the offense was committed, provided that you believe from the evidence that it was committed, and that the same was committed within three years prior to the filing of the information in this case, taking into consideration, however, the first paragraph of this instruction hereinabove set out, and if on any particular count as charged in the information any evidence of alibi is sufficient to raise a reasonable doubt as to the guilt of the defendant on that particular count, you should then give the defendant the benefit of that doubt on that particular count.

"The Court further instructs the jury that the information in this case was filed in the Los Angeles County Clerk's office on February 11, 1941."

The defense of alibi was not involved. The question as to time was whether the prosecutrix ceased coming to defendant's home in 1937 or 1938. It was her absence during the summer of 1938 that was heavily relied upon by defendant, not his own absence, and the question of abili had nothing to do with the defense of the statute of limitations upon which defendant relied nor with any other issue in the case. The instruction was a confusing attempt to state three legal propositions; first, to define the defense of alibi; second, to state that the proof need not show the commission of the several offenses on or about the several dates charged in the information but that it would be sufficient if it established the commission of the crimes, severally, at any time within three years prior to the filing of the information and, third, that if the offense charged in count I (the only one as to which the statute could have operated, under the evidence, as a defense) was proven to have been committed, defendant would be entitled to an acquittal if the date of the offense was more than three years prior to the filing of the information. Without simplicity and clarity in the expression of legal

principles, jury instructions must inevitably defeat rather than accomplish their purpose. What was the jury to understand from the statement in the instruction reading, "taking into consideration, however, the first paragraph of this instruction hereinabove set out"? What would the jury know about the paragraphs of the writing which was being read to them? And if they had been able to identify the paragraph referred to, how would they have been able to see any connection between the proof as to the date of an offense and any doubt they might have of defendant's "presence at the time and place of the commission of the crime charged." A common result of a shot at the flock is to bring down nothing but feathers. A "stock" instruction, unsuited to the case, stating irrelevant principles and confusing those that are relevant cannot be expected to produce any better results. Defendant was entitled to a simple, direct and specific instruction as to his defense of the statute of limitations as applied to the proof under count I. Such an instruction was not given. The instruction as given implied that there was a statute of limitations of three years but did not state that the bar of the statute would constitute a valid defense, and what was said on the subject was qualified by the ambiguous phrase above quoted. We cannot know how this instruction was understood by the several members of the jury nor whether it affected their verdict. There is so much uncertainty about it that we are not inclined to predicate a reversal upon any prejudice we might believe resulted from it. We cannot leave the subject without observing that the district attorney would do well to discontinue the use of this instruction, which was given at his request.

For the foregoing reasons the judgment of conviction and the order denying a new trial under count I must be reversed.

What has been said as to the erroneous instruction on corpus delicti and of the misconduct of the district attorney is applicable to counts II and III, although we do not reach the same result as to the disposition that should be made of the case under each of those counts.

A reversal of the conviction under count III is also required for the reason that the instruction on corpus delicti and the misconduct of the district attorney, with certain additional errors to be discussed, considered in the light of the evidence under that count, resulted in a miscarriage of justice.

As to this count corroboration of the testimony of the

prosecuting witness was required if he was found to be an accomplice. The inference that he was such accomplice was so strong and the corroborating evidence under this count so weak that the errors committed in the trial preclude an affirmance of the judgment under section 4½, article VI, of the Constitution. The boy, John, who was 15 years of age at the time of trial, had frequently visited defendant in his home, as had many other children; he testified that he had visited defendant over a long period of time and as often as twice a week. On January 7, 1941, he was apprehended by police officers in the commission of an act of personal misconduct at a service station and was taken to his home, where he was questioned by his mother. She was called as a witness and testified, over defendant's objection, that John at that time made a complaint to her about defendant, no details of the complaint being given. Count II charged an offense committed March 24, 1940, and count III an offense committed December 12, 1940. The inference would be that the complaint to the mother related to both dates.

It is sought to justify the introduction of this testimony under the rule that where an offense of the nature of those here charged has been committed against one under legal age, the fact that a complaint was made while the occurrence was recent may be proved by the victim or by the person to whom the complaint was made. The point is made by appellant that the complaint as made was not as to a ''recent'' occurrence within the applicable meaning of the word, and this contention must be upheld.

 It is the settled law in this state that evidence of the fact that the victim of rape made complaint of the occurrence is admissible in a criminal prosecution (*People* v. *Mayes,* (1885) 66 Cal. 597 [6 Pac. 691, 56 Am. Rep. 126]; and cases collected in 22 Cal. Jur. 383-4.) According to Mr. Greenleaf, as quoted in the cited case, such evidence is admissible only as corroborative of the testimony of the prosecutrix. The original reason for the rule was that since it is presumably the natural thing for a female who has been outraged to make outcry or prompt complaint of the crime, the fact that she did promptly complain is provable to meet the inference of consent which might be drawn from her silence. In *People* v. *Wilmot,* (1903) 139 Cal. 103, 105 [72 Pac. 838], the court said in that connection, ''The reason for the rule admitting such testimony would appear to be wanting in the case where the act is accomplished

with a female who fully understands the nature thereof and freely and voluntarily submits thereto. Doubtless, however, evidence of the fact of *complaint of injury* on the part of one under the age of legal consent would in most cases be competent and this court has in this respect made no distinction between cases where there was actual resistance and those where resistance and nonconsent were conclusively inferred by the law.'' In *People* v. *O'Bryan,* (1933) 132 Cal. App. 496 [23 P. (2d) 94], at 503, it was said, ''We think it may be fairly stated as the general rule that evidence as to the complaints of an outraged woman may be admitted only as corroborating or sustaining her testimony, and that when she does not appear as a witness, even the fact that she made complaint, however recently after the injury, is not admissible. There is an exception to this rule in the case of a child too young to testify, the courts holding that testimony as to the complaint in such case and under certain circumstances may be given by the person to whom complaint is made. (*People* v. *Figueroa,* 134 Cal. 159, 162 [66 Pac. 202]; *People* v. *Bianchino,* 5 Cal. App. 633, 636 [91 Pac. 112].) We know of no other exception.''

This type of evidence escapes exclusion under the hearsay rule only because it portrays a verbal act manifested while the victim is influenced by the shock of mistreatment and because the fact of complaint expresses a spontaneous reaction to an unusual and disturbing experience. A mere casual recital of the facts to acquaintances is not such a complaint as may be proved (*People* v. *Wilmot, supra*) nor is an admission obtained from a child as the result of a spanking (*People* v. *Ewing,* (1925) 71 Cal. App. 138, 142 [234 Pac. 917].) It is important to bear in mind that the hearsay rule has never been relaxed so as to allow evidence of the substance of the statements constituting the complaint. A conviction in the Mayes case, *supra,* was reversed because of the improper allowance of evidence of the details of statements made by complainant to her sister concerning the defendant's conduct, and subsequent cases have held strictly to that doctrine. And it must be apparent that a complaint which is a verbal act of the victim when made under the influence of shock resulting from the experience becomes mere hearsay when it is made after the shock has worn off and appears to have been a dispassionate recital of a past event. Therefore the element of time becomes highly important. A review of a great number of reported cases in our state discloses that there has been

a general recognition of the rule that complaints cannot be proved unless they have been made promptly. Most of the cases involved such complaints and we find constant repetition of statements that the complaints had been made immediately or shortly after the occurrence. And we also find constant repetition of the rule that complaints to be provable in such cases must have been made "immediately," "as soon as possible," "at the earliest practical moment," "at the earliest opportunity," etc. In fact, the importance of the element of time has never been questioned. In the few cases where it has appeared that there was unexcused delay in making complaint, proof of the complaint has been held to be prejudicial error. In *People* v. *Lambert*, (1898) 120 Cal. 170 [52 Pac. 307], there had been a delay of something less than two months; in *People* v. *Gonzalez*, (1907) 6 Cal. App. 255 [91 Pac. 1013], there had been a delay of a month and a half, and in each case the testimony was held to have been inadmissible under the hearsay rule. In *People* v. *O'Bryan, supra*, 132 Cal. App. 496 [23 P. (2d) 94], a police officer had testified over objection of the defendant that an adult victim of an alleged attempt to commit incest had appeared at the police station some four hours after the commission of the alleged crime and made complaint "concerning a lascivious attack committed upon her by her father, O'Bryan, the defendant in this case." The court said of this testimony (p. 503): "Whether the alleged victim of the assault in this case would have testified that she made complaint to the police officer we shall never know, because she died before the case first came to trial. Having in mind the fact that testimony of a complaint made as soon as possible after an attack is admissible in the case of an adult victim of rape to demonstrate the fact that the act was committed against her will, and knowing that instead of making an immediate complaint the woman alleged to have been injured in this case did not telephone the police or go to the police station, if at all, until approximately four hours after the time of the offense charged, and then only after defendant had refused to go back to her house at the point of Wilemon's gun there to settle with her husband we seriously doubt whether the admission of her own testimony on these points would have been justified."

In *People* v. *Bianchino*, (1907) 5 Cal. App. 633 [91 Pac. 112], a case involving a 5-year-old girl who had no understanding of the seriousness of the offense (rape), it was held

not error to receive evidence of a complaint made several weeks after the assault and at a time when a physical examination by a physician disclosed injuries and a venereal infection. The exceptional circumstances of the case were pointed out in the opinion as bringing it substantially within the rule justifying evidence of complaints.

The admission of evidence of a complaint made by the boy to his mother was unquestionably erroneous. Almost ten months had elapsed since the date of the first charged offense and almost a month since the last one. If it be argued that the case falls within the holding of the Bianchino case, which is the most that could be argued in support of the court's ruling, the dissimilarity of the facts answers the argument. Instead of a 5-year-old girl we have here a boy who was almost 14 years of age at the time of the first alleged offense and 14½ years old at the time of the last one. Not only that, but there was testimony by the same police officer that the boy admitted that he had participated with defendant in committing upon the person of defendant the identical act constituting a violation of section 288a of the Penal Code which he had accused defendant of having committed with him, as charged in count III. To be sure, the boy testified that until he was told so by the officers he did not know that his acts or those of defendant to which he testified were wrong, but this testimony, which would be expected of any prosecuting witness under the same circumstances, was not sufficient to justify the testimony as to complaints made under the circumstances related. Furthermore, the accusations against defendant were made under conditions which would have prompted the boy to seek justification or excuse for his own misdeeds, which had resulted in his apprehension by the police. Needless to say, he had had ample opportunity to make complaint and if his mere statement that he did not appreciate the wrongful nature of the acts would be sufficient foundation for evidence of the complaints, the bars would be down for admission of such evidence in all similar cases where, in the absence of such testimony, evidence of complaints would be pure hearsay. In addition to all of this, it further appeared without contradiction that in the latter part of January, 1941, he was again questioned by his mother and the police officers in the presence of defendant at the police station. There he had first answered that the defendant had done nothing to him. His mother then said to him, ''You have got to say what you told me before'' and the officer said, ''Now you have got to say what you told

me before,'' whereupon the boy made statements to the effect that both he and the defendant had committed the several acts mentioned. Thus it was brought before the jury definitely what would nevertheless have been inferred, namely, that the several complaints theretofore made by the boy had constituted a recital of such acts.

The testimony of the mother with reference to her son's complaint was admitted over defendant's objection. The testimony of the officers as to the bare fact that a complaint was made by the boy on the following day came in without objection. The testimony relative to the boy's accusations made in the presence of the defendant some two weeks later was admissible and, as we have seen, covered the same field as the statements made to the mother and the officers. Neither the fact that the objectionable testimony of the officers as to complaint having been made was not objected to nor the fact that the boy later repeated his charges in the presence of defendant detracts from the error in the admission of the mother's testimony. Even if the officers' testimony had been objected to and excluded, the harm had already been done in receiving the mother's testimony. Defendant's counsel no doubt had reason to believe that any objection they might make to the testimony of the officers would be overruled as previous objections had been. Sufficient has been said upon this subject to show error in the admission of the testimony of the boy's complaints and the prejudicial nature of the evidence.

The jury was instructed that the charges in counts I and II required no corroboration; that corroboration of the testimony of John was required under count III, provided he was found to be an accomplice of defendant in the act charged and, in effect, that whether he was an accomplice depended upon whether he knew that the act committed was a crime in which he was assisting at the time of its commission. We cannot know whether the jury regarded him as an accomplice. He was a school boy who had apparently normal mentality; at least it was not shown that he was a stupid boy. He was 14½ years old at the time of the commission of the act charged in count III and was not shown to have acted involuntarily upon any of the occasions to which his testimony related. It must be conceded that it would have been wholly within the bounds of reason for the jury to have found that he was an accomplice as to the act charged in count III and similar acts

68

which he admitted he himself had committed. (*People* v. *Robbins,* (1915) 171 Cal. 466, 472 [154 Pac. 317].)

In view of what is considered to be the extreme likelihood that the jury regarded the boy as an accomplice to the crime charged in the third count, it is important to consider in this connection also the instruction as to corpus delicti which we have already discussed. If the boy should be considered as an accomplice, a serious doubt would exist as to whether there was sufficient corroboration to sustain a conviction under count III. The principal corroborative evidence consisted of oral and written admissions to which we shall presently refer. Defendant had consistently denied having committed the act charged in count III. There were reasonable grounds upon which the jury could have found that the boy was an accomplice, that his testimony was without sufficient corroboration and that the admissions of defendant were wholly insufficient to show guilt of this offense, and if they had so believed, it would have been their duty to acquit. They could have construed defendant's admissions as implying guilt of this offense but could have believed that there was no other evidence which they deemed sufficient to prove the elements of the offense, and if they had so believed, it would have been their duty to acquit. But under this instruction they were not free to follow either of these courses. The court, as they were told, had passed upon the weight of the evidence tending to prove the elements of the offense, and they could not know the difference between a determination as to the sufficiency of the evidence to meet a rule of law and its sufficiency to establish guilt. The instruction was especially harmful to the defense to count III because of the close question whether the boy was an accomplice. Bearing in mind the weakness of the evidence relied upon by the prosecution for a conviction under count I and the culpable admissions of the prosecuting witness and the lack of corroboration of his testimony under count III, the language of the Supreme Court in *People* v. *Baldwin,* (1897) 117 Cal. 244, 249 [49 Pac. 186], is particularly appropriate. The court there said: ''In this class of prosecutions the defendant, owing to natural instincts and laudable sentiments on the part of the jury, and the usual circumstances of isolation of the parties involved at the commission of the offense, is, as a rule, so disproportionately at the mercy of the prosecutrix' evidence, that he should be given the full

measure of every legal right in an endeavor to maintain his innocence." Because of these errors, the conviction under count III must be reversed.

■ We have next to consider the effect of the errors already discussed upon the conviction under count II. This charged an offense as to which no corroboration was required. Notwithstanding the errors which require a reversal under counts I and III, the same result will not follow as to the conviction under count II unless we are convinced from a consideration of all of the evidence and the significance of the errors as affecting the verdict that there has been a miscarriage of justice within the meaning of section 4½, article VI, of the Constitution. It therefore becomes necessary to recite the substance of the evidence tending to establish guilt.

■ Defendant was called before some of the members of the faculty of the institution where he was employed, was informed of charges brought to their attention respecting his treatment of children, and following a conference, resigned his professorship. He then voluntarily accompanied a police officer employed by the institution to a police station, where he was questioned by officers and made a written statement and certain oral admissions to which we shall refer. Upon the following day he was confronted by John in the presence of the latter's mother and two officers. Upon that occasion John, in the presence of the named persons, made statements accusing defendant of the offenses charged against him. At the conclusion of the interview defendant said to John's mother, "I am sorry that this happened to your boy, Mrs. [Doe]. Please try not to think too badly about me." She answered, "Professor, I don't know what to say. I had such faith in you" and he replied, "I know you had." Upon the preceding day defendant, in the presence of the officers, in his own hand wrote a statement headed "Confession," which read, in part: "I do not wish to be a menace to children. I feel that I am, and shall probably continue to be while I have my liberty. Therefore I make this confession of essential guilt, in the hope that society will do something to remove the threat of my being at large.

"Accusations: excessive fondling [John Doe] (guilty); feeling of sex parts (if true, unintentional, but in some cases perhaps not without foundation) [here are named the children involved in counts I and III and another female child]

(one act, about July, 1940) (Last act with [John Doe], about December 12, 1940.) . . .

"In all, so many children have been involved, and such interpretations have been made, and such psychological foundations exist, that I wish to make my general plea guilty."

Even more damning statements were made in the writing but we find it unnecessary to quote or discuss the same or defendant's lengthy attempts on the stand to explain away the manifest implications of guilt which they plainly convey. Two police officers testified to oral admissions made by defendant which were so complete and specific as to be in themselves irreconcilable with innocence of violations of section 288 of the Penal Code. In his testimony at the trial defendant admitted having made many of the statements testified to by the officers, and with reference to such statements as well as to the written statements that he had made, gave lengthy explanations to the general effect that he had admitted to the officers that the various acts could have been committed and that certain results of a sexual nature, stated in their raw details, could have been accomplished, but that he had not intended to admit that they had actually happened. It cannot be doubted for a moment that these admissions, if believed by the jury to have been truthfully made, taken in connection with the testimony of the prosecuting witness, if believed, and the evidence of frequent opportunities for commission of such offenses, furnished complete evidence of defendant's guilt under count II of the information. And here we might say, because we have not heretofore discussed the effect of defendant's admissions, that they do not apply with anything like the same force to the charge under count III, which defendant at all times denied, nor were they as potent under the weak independent evidence applying to count I as they were as applied to count II.

The weight which was to be accorded defendant's oral and written admissions depended largely upon defendant's motives in making the statements and whether they were voluntarily made. It is not contended that the statements were induced by threats (except as hereinafter noted), fear or promises of any nature nor that they were the result of any adverse pressure or overpersuasion on the part of the officers. Defendant was asked by the officers to make a statement and did so before he was placed under arrest. He was told by one of the officers that they wanted no statement

unless it contained the truth and he composed his written statement with deliberation. The major part of the discussion with the officers followed the writing of the statement and contained further statements which in themselves constituted a confession of sexually-induced practices with children, although they fell short of express admissions of guilt of the specific offenses charged. Defendant's explanation of the circumstances under which the admissions were made and of his motives in making them were given upon the stand at great length. A few excerpts from the record will be sufficient to illustrate the tenor of the testimony in this connection.

"A. He [Officer Lake] told me that I should make a confession or a statement. He didn't promise me that I would escape trial or that the children would not be brought in as witnesses. He didn't promise me anything. But he told me I should make a confession or a statement, and I said that I would like to accomplish that, in spite of the fact that I was innocent of the charges against me, and then we discussed whether I should write such a statement or make it orally. I said that I would write it.

"Q. Now, did Officer Lake say anything with reference to your statement that you would like to accomplish the arrest even though you were innocent of the charge?

"A. Officer Lake told me that he just couldn't understand a person who wanted to confess to crimes that they had not done, and he gave me several instances of people who had done so. He told me that he thought he would not be able to sleep nights if he were conscious that he had sent an innocent man to prison.

"Q. Then what did you do?

"A. I might—yes, I will tell you, I wrote my statement, but I would like to add to what I was saying before that I had no intention of making a false confession or saying anything that was untrue. I wanted to write a statement which would do just what I have said I wanted to do, which would get me ultimately in prison and would not involve the children in any further harm or make them tell any more lies about me, or about anything else, just leave them out of it, if I possibly could. . . . I valued my own freedom, and my own future life, at just about zero. I didn't care whether I were free or not free. I felt that these charges had forever made it impossible for me to be an acceptable member of

society, and especially the society of children. Any child hereafter who was even seen talking to me would be subject to suspicion, and might be brought in for questioning on very personal matters. Parents would have no faith in me, and my life with children was at an end. . . . It says, 'Without any threat of any kind,' Mr. Lake had told me that he would bring the children to witness against me. He said I believe that he might be able to bring as many as thirty children to bear testimony against me. It didn't occur to me at the time, but it is true that that was the very soundest threat that he could have possibly made; nothing would have driven me to write a statement like that sooner than such a statement.

"Q. Why?

"A. I was filled with absolute horror at the thought of having thirty children, or even two children, dragged out to go through matters of that kind. I felt that would do them incalculable harm. I felt that any harm that might be done to me was simply infinitesimal in comparison to the harm that would be done to those children. Children are in a malleable and plastic state of development, and harm to them at that time is just criminal. I felt that the very thought that they had involved me by mentioning my name, had already involved me terribly in their statements—and I didn't want to involve them one bit further, if I could help it. So that in the view that there was a threat, which though it may not have been meant as a threat, had a very powerful effect upon me."

One of defendant's witnesses was a psychiatrist, who testified at length about defendant's mental condition and characteristics. We find in his testimony such statements as the following: "I regarded his sexual immaturity to be a pathological situation, he having failed to grow up beyond the infantile or childish level in his sexual interest. . . . It would be an example of a pathological mental state, a mental disorder. . . . I would say that he has remained essentially infantile in his sexual development, although from an adult standpoint he is essentially asexual. . . . No, I mean that psychologically his interests in sex were those of a small child. . . .

"Q. Now, you say in your opinion Dr. Hubbell has an illness?

"A. Yes, this is a mental illness.

"Q. Would you say he is insane or ever has been?

"A. No, I said he is not insane."

After reading at length the testimony of the physician, which was to the same general effect as the portions we have quoted, we have been unable to discern what fact or facts pertinent to the defense of not guilty were attempted to be established or that the testimony had any bearing at all upon that defense. The clear impression conveyed by a reading of the testimony of defendant relating to his oral and written admissions, and that of the physician, is that the tragic aberration of which defendant was pictured as the unfortunate victim brought him unwillingly to the borderline of the offenses charged. The testimony, as we read it, is corroborative of the other evidence tending to establish guilt. This conclusion necessarily follows from the fact that the defense was that the acts charged had not been committed and from the further fact that the deficiencies of defendant, however they be classified, would not avail to establish his innocence if the acts were committed with any of the elements of intent entering into the crime as defined by the Penal Code.

It is contended that the failure of the court to instruct the jury as to the law pertaining to the admission and consideration of evidence of a confession requires a reversal of the convictions as to all counts. No such instruction was requested by defendant but it is claimed that it was the duty of the court to give one of its own motion. Undoubtedly it is the duty of the court in criminal cases to give instructions on the general principles of law applicable to the case on trial, even though they are not proposed or requested by the parties. (*People* v. *Scofield*, (1928) 203 Cal. 703, 709 [265 Pac. 914]; *People* v. *Heddens*, (1936) 12 Cal. App. (2d) 245 [55 P. (2d) 230]; *People* v. *Curran*, (1938) 24 Cal. App. (2d) 673, 676 [75 P. (2d) 1090]; *People* v. *Warren*, (1940) 16 Cal. (2d) 103, 116 [104 P. (2d) 1024].) We may assume, although it is not so stated by appellant, that the principles of law he has in mind are those stated in *People* v. *Dye*, (1931) 119 Cal. App. 262, 270 [6 P. (2d) 313], namely, that if evidence of a confession is admitted, it is for the jury to determine whether the confession was freely and voluntarily made and therefore entitled to consideration, and that it may not be used against a defendant or considered by the jury as evidence in the case unless the jury shall believe from the proof as to the circumstances under which it was given that it was in fact freely and voluntarily made or, in other words, made without previous inducement, duress, threats or intimidation. The court,

speaking through Mr. Presiding Justice Conrey, said (p. 270): "To 'threats and inducements' we think it appropriate to add, any illegal process whereby through external means of pressure the free will of the defendant has been overcome." We may concede for the purposes of this opinion that it is the duty of the court to so instruct the jury of its own motion in every case in which evidence is received of an admission by the defendant which could reasonably be construed or is contended by the prosecution to be a confession, if there is a failure of proof on the part of the prosecution or other evidence in the case which would reasonably lead to a belief that the confession was not freely and voluntarily made. We may also concede what defendant at the trial strenuously denied, that his written and oral statements did amount to a confession. We are nevertheless of the opinion that if the state of the evidence is such that it admits of no rational conclusion other than that the confession was freely and voluntarily made, there is no necessity for instructions as to the governing rules of law with relation to the receipt and consideration of confessions, and that the failure of the court to give such instructions of its own motion does not constitute error. Here the evidence of the prosecution did establish, prima facie, a sufficient foundation for the introduction of the confession. We find nothing in the evidence of defendant which is in conflict with the evidence of the prosecution upon that subject, nor do we find anything in defendant's testimony, given its fullest effect, which tends to show that the confession in a legal sense was not free and voluntary. His testimony is replete with assertions that he was hopeless for his own future, that he was solicitous of the welfare of the children involved, that he felt that they would be harmed if brought to court to testify in the case, that he was more interested in their welfare than in his own, and that it was his motive and desire in making his written and oral admissions to bring about his own incarceration in a manner that would avoid the appearance of the children in court.

It will be noticed in the foregoing quotations from defendant's testimony that one of the officers stated to defendant that he would bring as many as thirty children to bear witness against defendant. It is now argued that this statement constituted a threat and that defendant was induced thereby to make the alleged confession in order to save the children the embarrassment and harm that might come from their appearance in court. No authority is cited which supports this

proposition and we consider it untenable. A reading of the testimony of defendant with relation to this incident refutes the argument that defendant in making the confession acted upon the statement of the officer and he definitely testified that it would have made no difference to him whether two children or thirty children had been involved. But the statement of the officer was not the sort of threat or intimidation that would have rendered the confession involuntary had it been acted upon. The brief quotation we have made from *People v. Dye, supra*, 119 Cal. App. 262 [6 P. (2d) 313], is broad and comprehensive and recognizes that the process which can invalidate a confession must be exercised "through external means of pressure." Regardless of what defendant's motives may have been, there were no "external means of pressure" used. The officers suggested to defendant that he make a statement. They did not insist upon it nor does it appear that the witness was reluctant to make one. In fact, it appears that he wished to make a statement, not on account of any benefit that he hoped to receive, but because, as he testified, he did not wish the children to be brought into court. It affirmatively appears from defendant's testimony that the officer did not promise him that he would escape trial or that the children would not be brought in as witnesses, and that he made no promise whatever, and yet under these circumstances defendant said that he would like to make a statement. Even if he had had some secret hope that a confession would be to his advantage, that would not have rendered the confession inadmissible. (*People v. Luis*, (1910) 158 Cal. 185, 191 [110 Pac. 580].) His desire to save the children from being brought into court did not tend any more strongly to show an involuntary nature of the confession than did the wish of the defendant in *People v. Smalling*, (1892) 94 Cal. 112, 113 [29 Pac. 421], to take responsibility for the crime upon himself in order to free his sister, who was also under arrest, which motive was held not to invalidate his confession as material and competent evidence. It must be apparent that a confession dictated by the hopes and motives of the accused and inspired solely by his own mental processes and emotions is voluntary in a legal sense. It is not the pressure of the circumstances surrounding an accused person, but pressure exerted by others tending to influence his actions, that is to be weighed in determining whether his confession of guilt has been made voluntarily or under the compulsion of external

influences. We are satisfied that there is to be found in the record no basis which the jury could reasonably have regarded as a valid ground for disregarding defendant's alleged confession as involuntary or for believing that his willingness to make the confession was to any extent the result of the act or conduct of any other person, and we conclude therefore that there was no error in the failure of the court to give the instruction. (*People* v. *Chan Chaun*, (1940) 41 Cal. App. (2d) 586, 592 [107 P. (2d) 455] and cases there cited.)

 Defendant tendered an instruction reading in part as follows: ". . . that admissions of the defendant whenever made are not sufficient to convict him unless the prosecution proves beyond a reasonable doubt by testimony other than admissions of the defendant that the defendant committed the offense or offenses with which he is charged in the information on file." The court declined to give the instruction. No other instruction was asked and none was given on the subject of admissions or confessions. The instruction did not correctly state the law, for it is not true, of course, that the proof, independently of any admissions of the defendant, must be sufficient to establish guilt beyond a reasonable doubt before a conviction can be had. The instruction therefore was properly refused.

 Defendant complains of an instruction to the effect that he should be conclusively presumed to be sane on the dates of the alleged offenses and at the time of trial. No defense of insanity was interposed but we believe no harm could have resulted from the instruction. The testimony of defendant, of the physician hereinbefore quoted and that of another of defendant's witnesses who had volunteered the statement that she did not believe that anyone would have committed the acts charged if he had been sane furnished a sufficient reason for the instruction. After reading the testimony of defendant in full we entertain no doubt as to his sanity, but we cannot say that it could not have left a contrary impression upon the minds of the jurors. The vice which counsel attributes to the instruction is that it suggested that defendant was relying upon insanity as a defense and that this was highly prejudicial to his case as it was presented. We think the jury could not have received any such impression but would have understood the contrary.

Other instructions complained of were identical with those recently approved in *People* v. *Kearney*, (1942) 20 Cal.

(2d) 435 [126 P. (2d) 612], and they require no specific attention.

In his closing argument the district attorney stated that he was precluded by rules of law from proving the statements made by the children to their mothers while the defense was not so limited, and he said in part, "So I can only say they didn't dare to ask the mothers what the children told them—Mrs. T., for instance, or Mrs. B." The statement was assigned as misconduct and the court admonished the jury to consider it "as purely argument of counsel and not as evidence." If, as now suggested by the People, the statement probably was made in reply to some argument by the defense, the better course for the district attorney would have been to object to statements of defense counsel which might have called forth an improper reply to an improper argument. But as defendant has failed to comply with section 7 of rule II of this court, under which he was required to bring up in the transcript anything said by his own counsel which may have prompted the statement complained of, we have no way of judging whether the statement was wholly unwarranted or had been invited by statements equally improper. Upon the record before us no misconduct is shown in this incident which would call for a reversal.

It is our opinion that the testimony of the boy John as to the commission of the offense charged in count II, considered with the other evidence which we have noted, presented a case so strong as to preclude a reversal, notwithstanding the errors which we have discussed.

The judgments and the order denying motion for new trial as to counts I and III of the information are reversed and the cause is remanded for a new trial; the judgment and order denying motion for new trial as to count II are affirmed.

Shaw, J. pro tem., concurred.

SCHAUER, P. J.—I concur in the judgment and in everything said in Mr. Justice Shinn's opinion except certain portions of it which deal with defendant's asserted confession and which are inconsistent with the views hereinafter expressed. Defendant's statement, as applied to count II, in my opinion constitutes a confession. While the evidence tending to negative its voluntary character seems to me to

be of little weight I believe that we cannot say that as a matter of law there was *no* issue of fact as to whether such confession was voluntarily given. Such issue should have been submitted to the jury with appropriate instructions. Upon the entire record, however, I am of the opinion that the failure to so submit such issue did not affect the verdict as to count II.

A petition for a rehearing was denied August 24, 1942, and appellant's petition for a hearing by the Supreme Court was denied September 10, 1942.