[Crim. No. 6726. In Bank. Feb. 9, 1961.]

THE PEOPLE, Respondent, v. JOE ORVILLE BURTON, Appellant.

Gladys Towles Root, Eugene V. McPherson and Robert Barnett for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant appeals from a judgment of conviction pursuant to jury verdicts which found him guilty of two charges of violating Penal Code, section 288 (two lewd acts allegedly committed about an hour apart on August 15, 1958, against W, a 7-year-old girl), and from an order denying his motion for new trial. Defendant urges that W was not a competent witness, that defendant's right of cross-examination was improperly restricted, that prejudicial evidence was erroneously received, and that the trial judge deprived defendant of his right to a verdict fairly expressing the independent opinion of each juror. We have concluded that many of the matters of which defendant complains were not errors and that, in any event, no miscarriage of justice appears. Accordingly, the judgment should be affirmed (Cal. Const., art. VI, § 4½).

*The People's Evidence as to Events and Declarations of August 15 and 16, 1958.* W is the 7-year-old stepdaughter of defendant. Mrs. Burton (defendant's wife and the mother of W) was away from the Burton home, in the company of her brother and Mrs. Marie Brownen, from shortly after 9 p. m. on the night of August 15 until about 1:30 a. m. on August 16. Defendant was left with W, another stepdaughter 5 years of age, and a 5-year-old neighbor boy. W testified that defendant, in the living room, twice "made me play with his peter," once while the younger children were in the yard and again after they had gone to bed in the girls' bedroom. W's testimony included further description of the circumstances of the two crimes.

When Mrs. Burton returned home in the early morning of August 16, with her brother and Mrs. Brownen, W was in bed in the children's room and defendant was in bed in the Burtons' room. Mrs. Burton testified as a witness for the People that she saw that W was awake; "I asked her why she wasn't asleep and she said she just couldn't go to sleep." Mrs. Burton began a quarrel with defendant and he hit her in the face with his elbow. She returned to W and said, "You mustn't story to me. . . . What's the matter with you? Why can't you go to sleep? . . . You know you go to Sunday School every Sunday and Jesus in Heaven, he is supposed to protect you . . . You better tell the truth." W then said

(in the words previously quoted from her testimony) that defendant had sexually molested her. (Such words are the same general description of defendant's conduct that appears throughout W's testimony and extrajudicial declarations.)

Mrs. Brownen testified that immediately after W reported defendant's molestation, Mrs. Burton said to defendant, " 'Yes, you God damn son of a bitch, you have did this before and you've been doing it all the time.' He stated, 'Shut your God damn mouth or I'll break your neck.' . . . [S]he said, 'I'll have you threw in jail . . . I'll call an officer.' He said, 'Yes, and I'll break your God damn neck . . . Regardless. . . . It couldn't be no worse than you going to the bar and let some man feel up your dress'. . . ."

In an interview by a deputy sheriff beginning at 5:20 a. m. on August 16, defendant denied that he had at any time molested W. The interview also includes the following statements:

Officer: "Would you have any explanation as to why the little girl would say such a thing?"

Defendant: "I have one, but it's my own. Course lotsa things I hear and, to this account, I've heard it for better than a year now. But . . . I don't know how to explain anything like that. . . . [Y]ou've got me there in a puzzle because if she wants something from me or wants me to do something for her, this—that she can get around and accuse me of something like that to hold that over me and just like I told her mother better than a year ago, I said, 'You're gonna keep on . . . You've accused me of that. . . . You're gonna get me in trouble.' . . ."

Officer: "What would . . . you say should . . . semen . . . be found on her body?"

Defendant: "You mean like I had an intercourse with her? . . . Why, I'd be guilty."

Officer: "Well, we're having her checked over right now by a doctor."

Defendant: "Well, that's all right with me."

Officer: "And we will check . . . her clothing that she was wearing. We're going to have to check yours, too."

Defendant: "Well, you can check mine or her either one, but as far as . . . my own, . . . I even had intercourse with my wife. . . ."

Officer: "When?"

Defendant: "I guess it's been about—it was either last night or night before."

Officer: "Well, that . . . would be . . . easily separated from anything that might have happened—"

Defendant: "You mean with her clothes on?

" (Pause.)

"As far as her—as me bothering her—I—"

Officer: "Well, do you know of anybody else that might have been playing with her?"

Defendant: "You mean a—men? . . . No. Not that I know of, because I don't think I'd stand around and let it be done in the first place."

A forensic chemist found semen stains on the nightgown worn by W and the shorts and trousers worn by defendant on the night of August 15.

*Evidence as to Prior Similar Offenses of Defendant Against W.* On direct examination W testified that defendant had committed the same crime against her on three prior occasions which she described. On cross-examination defense counsel asked W, "Now, did your mother ever catch your [step]father . . . doing this to you?" and W answered, "Not that I can remember of." Defense counsel then read in evidence W's testimony at the preliminary hearing that on two previous occasions (neither of which was among the three prior instances related by W on direct examination) "mommy caught him" and on one of these occasions, when they lived near a Miss Blackstone, Mrs. Burton called the police. Further cross-examination of W showed that she was uncertain or did not recall whether "mommy caught him" and also whether she had previously so testified. Thereafter defense counsel, to impeach the child, read in evidence her testimony at a former trial of this cause (which resulted in a hung jury); this testimony suggested that the child then had taken the position that her testimony at the preliminary hearing that "mommy caught him" was incorrect and was given because "I just forgot."

*Defense Evidence.* Mrs. Burton, as a witness for defendant, testified that prior to the morning of August 16 W had never complained of molestation by defendant and that Mrs. Burton had never seen defendant mistreat W sexually or in any other way.

Defendant testified that he had never molested W. He and his stepfather, Mr. Stewart, testified that from soon after Mrs. Burton's departure on the evening of August 15 until shortly before her return on August 16, Mr. Stewart was in the Burton home, the children were in bed in their room, and

during most of the time Mr. Burton was in bed in his room. This was corroborated by testimony of Mrs. Burton (that she saw Stewart's car approaching the Burton home as she left it shortly after 9 p. m.), a Mr. and Mrs. Hellen (that they stopped at the Burton home after 11 p. m., saw Stewart and defendant, and defendant apparently got up from bed to talk with them), and a Mr. Morse (that he stopped at the Burton home and talked with Stewart shortly before 12:30 a. m.).

Mr. and Mrs. Burton denied Mrs. Brownen's previously quoted description of their angry and profane exchange on the morning of August 16.

To explain the semen on the garments which defendant wore on August 15, Mr. and Mrs. Burton testified that shortly after 6 p. m. on that day they left their house, bought beer and groceries, and stopped on a mountain road and had sexual intercourse.[1] To explain the semen on W's nightgown Mrs. Burton testified that W and her little sister often got into the Burtons' bed; that this could have occurred after the Burton's had had sexual intercourse; and that the gown had not been washed for six weeks or more before the 15th because it was not worn very often.

We state the evidence at some length, and discuss defendant's claims of error in detail, because of the following circumstances: The evidence was, at least on the cold record, close and sharply conflicting. Also the following familiar psychological observations (in the words used by Sir Matthew Hale in the 17th century) apply: Accusation of a sex crime is "easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent," and "the court and jury may with so much ease be imposed upon without great care and vigilance; the heinousness of the offense many times transporting the judge and jury with so much indignation, that they are over hastily carried to the conviction of the person accused thereof, by the confident testimony sometimes of malicious and false witnesses." (1 Hale, Pleas of the Crown [1st American ed., 1847], pp. 634-635; *People* v. *Benson* (1856), 6 Cal. 221, 223 [65 Am.Dec. 506]; *People* v. *Putnam* (1942), 20 Cal.2d 885, 888, 891 [4]

---

[1]On rebuttal the People presented the testimony of Mrs. Burton's brother and Mrs. Brownen, who were at the Burton home during the late afternoon of August 15 and until they left with Mrs. Burton soon after 9 p. m., that during this time Mr. and Mrs. Burton did not leave the house together. Also the People introduced extrajudicial declarations of Mrs. Burton, made after the alleged offenses, that she last had intercourse with defendant a week or more before August 15.

[129 P.2d 367].) To properly appraise the effect of any error which may appear, an appellate court in reviewing a cause such as this must keep in mind these cautions, together with the fact that the People's case rests upon the testimony of a child of tender years, in this case a child who, by her own testimony, has demonstrated that she was in some respects a witness of uncertain memory or capacity to distinguish between fact and fancy or suggestion. (See *People* v. *Adams* (1939), 14 Cal.2d 154, 167-168 [93 P.2d 146]; *People* v. *Lamb* (1953), 121 Cal.App.2d 838, 843 [1] [264 P.2d 126].) This does not mean, of course, that the usual intendments in support of the judgment do not apply on this appeal, but rather that we recognize that errors which in other context might be trifling may have more serious import.

*W's Competence as a Witness.* ■ Defendant's claim that W was not competent could be regarded as impliedly waived by failure to raise it in the trial court. (*People* v. *Carpenter* (1955), 136 Cal.App.2d 726, 727 [1] [289 P.2d 251]; *People* v. *Lamb* (1953), *supra*, 121 Cal.App.2d 838, 847 [9].) But we consider the contention because, as in *People* v. *Allen* (1955), 131 Cal.App.2d 72, 73 [279 P.2d 996], "If an examination of the record indicated that the child was an incompetent witness we would be inclined to agree with appellant's counsel" that "it would be manifestly unfair to affirm appellant's conviction . . . merely because of the failure of his attorney to make proper objection in the trial court."

■ "If a child [under the age of ten years] possesses sufficient intelligence, understanding and ability to receive and fairly accurately recount his impressions[2] [Code Civ. Proc., § 1880, subd. 2] and he has an understanding of the nature of an oath and a moral sensibility to realize that he should tell the truth and that he is likely to be punished for a falsehood, he is competent to testify." (*People* v. *Loignon* (1958), 160 Cal.App.2d 412, 418 [5] [325 P.2d 541].)

■ "[N]o religious belief or conviction is necessary nor need the child have any detailed knowledge of the nature of the oath. As long as the child understands that some earthly

---

[2]It must, of course, appear that the child has the ability to distinguish between (1) "impressions" gained through the child's senses directly from objective manifestations and (2) "impressions" which are mere conclusions or are implanted by the suggestions of other persons. To determine whether a child has both the capacity to make and the character to respect this distinction, it is the duty of the trial judge to permit, if not himself to conduct, particularly careful and searching interrogation of the witness.

evil will follow if he does not tell the truth, that is all that is required." (*People* v. *Lamb* (1953), *supra*, 121 Cal.App.2d 838, 845 [6].)

█ *Voir dire* examination of W showed that she understood the difference between the truth and a lie, that her mother had told her that it was wrong to lie, and that she had promised to tell the truth in court. If defendant thought it necessary that there be further inquiry as to W's "perception as to [her] duty to speak the truth, and not to falsify" (*People* v. *Swist* (1902), 136 Cal. 520, 522 [69 P. 223]), he should have sought it before the commencement of the child's testimony in chief.

█ Defendant argues that W's incompetence as a witness appears from consideration of the whole of her testimony. He points out that in a number of instances she testified that she did not remember various matters and then, in answer to leading questions, gave testimony damaging to defendant as to some of those matters. He complains that her repeated description of the substance of the criminal act, given in reply to questions which were not leading, was so "startlingly direct" as to indicate that she had learned it from "coaching" prior to trial. Further, defendant says that W's incompetence is shown by the asserted inherent improbability of her testimony that on two previous occasions when defendant committed the lewd act an 18-year-old girl was present and did nothing. Appraisal of the effect of the foregoing aspects of the child's testimony was for the trier of fact; such circumstances as are shown here do not as a matter of law completely destroy her competence or credibility. █ It may also be mentioned that the trial judge and jury could consider the fact that W's testimony as to events of August 15 and 16 just before and after the period of Mrs. Burton's absence accords with testimony of her elders. (*People* v. *Coen* (1928), 205 Cal. 596, 608-609 [5] [271 P. 1074].)

*Asserted Improper Curtailment of Defendant's Right of Cross-Examination.* The direct examination of Mrs. Burton as a witness for the People concerned only the events of the early morning of August 16. On cross-examination, to test her observation and recollection, defense counsel adduced her testimony that she consumed considerable amounts of beer and liquor at various times and places starting at about 1:30 p.m. on August 15, and continuing until shortly before her return home on the morning of August 16. Then the following occurred: "Q. . . . . [Y]ou testified that some of the beer that

you obtained you and your husband had gone to town and gotten it that evening? A. Yes. Q. About what time was it that you went to town?'' The prosecutor objected that the inquiry went beyond the scope of direct examination and concerned ''an entirely separate foray on which I wish to impeach this witness if she testifies about it in this case.'' Defense counsel said that the purpose of the question was to test the witness' recollection and that the prosecuting attorney ''called her as his witness and he is bound by any testimony that she gives.'' The objection was sustained, defense counsel indicated that he had no further cross-examination, and the witness was excused.

 Upon its face the question to which objection was sustained was not improper, but neither was the trial judge's ruling. Cross-examination to test a witness' memory ''should be given a wide latitude'' (*People* v. *Watson* (1956), 46 Cal. 2d 818, 827 [2] [299 P.2d 243] ; see *Davis* v. *California Powder-works* (1890), 84 Cal. 617, 624, 625 [24 P. 387] ), but just because the field of permissible inquiry in this regard is so broad the trial judge must be given broad discretion to keep such cross-examination within reasonable bounds (*People* v. *La Macchia* (1953), 41 Cal.2d 738, 743 [1, 2] [264 P.2d 15] ).

[██] Furthermore, it is clear from the record of the trial and from defendant's argument on appeal that the question was not truly intended to test the witness' recollection. As the trial judge and counsel for both sides knew (for they had tried this case before, with the result that the former jury failed to reach a verdict), it was not anticipated that Mrs. Burton's recollection of the ''separate foray'' on the evening of August 15 would be so faulty as to discredit her; rather, it was anticipated that in describing that ''foray'' she would testify to her asserted Arcadianly inspired intercourse with defendant as an exculpatory explanation of the semen on his clothes. Defendant complains that he was ''forced'' to call Mrs. Burton as his own witness in order to bring out such testimony damaging to the People's case, and that the People were then allowed to impeach the witness by showing her prior contradictory statements. In other words defendant is complaining because the trial judge did not permit presentation of the evidence in such a manner that defendant could urge dubious application of the notion that a party ''vouches'' for the credibility of a witness produced by him.

When it became apparent that the seemingly innocuous question as to the time of an expedition for beer was directed

neither to the witness' credibility nor to the bringing out of additional and qualifying circumstances concerning subjects to which she had testified in chief (see Code Civ. Proc., § 2048), the judge properly stopped this line of cross-examination.

The judge did not suggest that defendant should refrain from other lines of inquiry, but counsel chose to terminate his cross-examination of Mrs. Burton. Thereafter, when the People had concluded their case in chief, defendant asked and was refused leave of court to recall her for further cross-examination. This ruling, too, was within the trial judge's sound discretion. (Code Civ. Proc., § 2050.)

Defendant urges that his cross-examination of W was improperly restricted by the sustaining of an objection to the question, "has anybody else done this to you?" The prosecutor stated as ground of objection that "It goes beyond the scope of the direct examination. There is no purpose to it." The trial judge added, "It is incompetent, irrelevant and immaterial, besides." On this appeal, as tending to support the trial judge's ruling, the attorney general relies upon the view of *People* v. *Pilgrim* (1958), 160 Cal.App.2d 528, 530 [2] [325 P.2d 143], that "the fact that some other persons might have done exactly what defendant did, would in no way have tended to prove that defendant did not so act." (Accord, *People* v. *Stratton* (1904), 141 Cal. 604, 606-607 [75 P. 166].)

The ruling was mistaken. If the child had answered "I don't remember" or "I don't know" to the question, "has anybody else done this to you?" the relevant effect on her credibility would be obvious. Or the question might have been preliminary to a proper showing that the child had made false charges against other men (*People* v. *Hurlburt* (1958), 166 Cal.App.2d 334, 337-343 [333 P.2d 82]) or that she was prone to gain "impressions" through suggestion as well as by direct observation. Since the question was on exploratory cross-examination, so that the examiner probably could not know what answer might be expected, the requirement of an offer of proof would be unreasonable. (*Tossman* v. *Newman* (1951), 37 Cal.2d 522, 525 [6] [233 P.2d 1]; *People* v. *Jones* (1911), 160 Cal. 358, 363-364 [117 P. 176].) However, when the trial judge, by his general ruling that the inquiry was "incompetent, irrelevant and immaterial," showed that he was overlooking the fact that it might have a proper purpose, we think that defense counsel should have indicated to the judge

the theory on which he based his question. Instead, he went on to a different line of inquiry.

 Furthermore, defendant on appeal does not claim that the question had a proper impeaching purpose. Rather, he presents the far-fetched argument that the inquiry was designed to adduce an answer to a question of a juror, asked of the court earlier in the course of the examination, "Where did a child like this learn this kind of language?" (The court properly replied, "I can't answer that question. You will have to make up your own mind about that.") Defendant says that the child's answer to the question concerning acts of "anybody else" was necessary to dispel dangerous speculation of the jury "that possibly the child learned these words from the defendant." The form of defense counsel's question does not suggest such purpose. If defense counsel really wished to show where W learned "this kind of language" he could have asked her. (See *People* v. *Trolinder* (1953), 121 Cal.App.2d 819, 823-824 [4] [264 P.2d 601].)

*Asserted Prejudicial Error in the Admission of Evidence and the Asking of Questions by the Prosecuting Attorney.* Over defendant's objection the testimony of Fayleen Hubbard was received to show implied admissions of defendant. Before Mrs. Hubbard testified, and afterward when defendant moved to strike her testimony, counsel for both parties in chambers fully discussed with the judge the theories on which the People offered and defendant objected to such testimony. Since we are principally concerned with the impact of the testimony on the jury, we first quote and appraise that which they heard; other matters presented only in chambers are hereinafter discussed.

Mrs. Hubbard testified that on September 11, 1958, defendant told her that "he wanted me to . . . sign a retraction on a statement I had made.

"Q [by Mr. Deem, the prosecuting attorney]. . . . What did you say? A. I told him that I'd be glad to if there was any doubt in my mind that he hadn't committed this thing, but there wasn't.

"THE COURT: When you said 'this thing', were you referring to this offense which he is being tried for now?

"THE WITNESS: Yes, sir.

"MR. DEEM: Q. And what else did you say? A. Anyway, he asked—I told him that there wasn't any doubt in my mind. He said, 'Well, I didn't say I didn't. I said you could help me get out of it.' . . . I asked him if he hadn't rather get

some help now while there was a chance than to wait until maybe the next one wouldn't be as lucky as this little girl he is accused of now. He asked me if I thought——

"Q. Did you say anything about the gas chamber? A. Yes, I told him, I said, 'Because——'

"MR. WAITE [defense counsel] : Now, if the Court please, we object to the question on the grounds it is leading and suggestive. . . .

"THE COURT : All right, overruled.[3] Go ahead.

"THE WITNESS : I told him the next little child might not be as lucky as this last one; that he was headed—I said, 'Joe, you know where you are headed, to the gas chamber.'

"MR. DEEM : Q. What did he answer to that? A. He didn't answer.

"MR. DEEM : I have nothing further for this witness, your Honor.

"CROSS-EXAMINATION

"MR. WAITE : Q. Were you present at any time in Ventura County on the 15th . . . or the 16th day of August, 1958 [the place and time of the charged crimes] ? A. No, sir.

"MR. DEEM : If your Honor please, I object to the question. It goes beyond the scope of the direct examination entirely and . . . is entirely immaterial and irrelevant.

"THE COURT : I don't see the relevancy of that.

"MR. MAXWELL [defense counsel] : Your Honor, she has testified that in her opinion this man was guilty of this offense with which he is charged. . . . We have a right, I believe, to show that that state of mind was not based on any actual fact which she saw or knew of her own knowledge. . . .

"MR. DEEM : That has nothing to do with the admission of the defendant which he made to her, and that is the purpose of the testimony. . . .

"THE COURT : . . . [Y]ou can't go into matters that are irrelevant and immaterial.

"Had you made some statement—I don't want you to say what statement you made or anything of that kind—but had you made some statement about this particular case that he wanted you to retract?

"THE WITNESS : No, sir, not about this one.

---

³The objection was properly overruled. The form of the question suggests only the simple, uninformative answer "Yes." It does not improperly suggest the substance of the testimony which the prosecutor desired (see Code Civ. Proc., § 2046) but merely directs the witness' attention to the subject matter of inquiry.

"THE COURT: What was it he wanted you to retract?

"MR. MAXWELL: . . . We . . . object to that on the basis that I think the jury should be excused before any further testimony of this witness is given.

"MR. DEEM: I will stipulate that the answer to that question would be inadmissible, your Honor.

"THE COURT: Well, I think so, too, but I didn't think there would be any objection to it. I thought maybe they would welcome that. All right, the objection is sustained."

Defendant's motion to strike all testimony of Mrs. Hubbard, and his motion for a mistrial on the ground that such testimony was incurably prejudicial, were heard and denied in chambers. Counsel for each side said that he had no further questions and the witness was excused.

 From Mrs. Hubbard's testimony the jury could draw inferences of admissible facts. In the context, although the specific content of her "statement" was not described, they could infer consciousness of guilt of the subject crimes from defendant's attempt to get a retraction of what the jury no doubt believed was evidence against him. (*People* v. *Weiss* (1958), 50 Cal.2d 535, 554 [6] [327 P.2d 527].) And defendant's evasive answer and silence could be found to be admissions of guilt as to "this little girl he is accused of now." (*People* v. *Davis* (1954), 43 Cal.2d 661, 670 [5] [276 P.2d 801].)

 But from Mrs. Hubbard's testimony the jury could also infer inadmissible facts. The People could not independently prove defendant's impliedly admitted opinion that his psychological make-up was such that he might in the future commit a capital offense against a little girl. "In the determination of probabilities of guilt, evidence of character is relevant." (*People* v. *Jones* (1954), 42 Cal.2d 219, 223 [5] [266 P.2d 38].) But "The rule . . ., firmly and universally established in policy and tradition, is that the prosecution may not initially attack the defendant's character"; this rule is particularly important in the trial of a charge of a sexual offense against a child because of "[t]he deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is in court." (1 Wigmore, Evidence [3d ed., 1940], § 57, p. 456.)

 Mrs. Hubbard's testimony also permits the inference of impliedly admitted accusations that defendant was guilty of some unspecified past misconduct which might be

inadmissible under "the general rule that evidence of other crimes, where it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, should be excluded because its probative value is outweighed by its prejudicial effect." (*People* v. *Westek* (1948), 31 Cal.2d 469, 476 [5] [190 P.2d 9].)

The case of *Adkins* v. *Brett* (1920), 184 Cal. 252, 256 [6] [193 P. 251], quotes from Wigmore the multiple admissibility doctrine which applies here: "[W]hen an evidentiary fact is offered for one purpose, and becomes admissible by satisfying all the rules applicable to it in that capacity, it is not inadmissible because it does not satisfy the rules applicable to it in some other capacity, and because the jury might improperly consider it in the latter capacity. This doctrine, although involving certain risks, is indispensable as a practical rule." (This statement is now found in 1 Wigmore, Evidence [3d ed., 1940], § 13, p. 300.)

The Adkins opinion (pp. 258-259 of 184 Cal., quoted in *People* v. *Sweeney* (1960), *ante*, pp. 27, 42-43 [9 Cal.Rptr. 793, 357 P.2d 1049]) also contains the following discussion of the problems attendant on the production of evidence such as that of Mrs. Hubbard: "The matter is largely one of discretion on the part of the trial judge. If the point to prove which the evidence is competent can just as well be proven by other evidence, or if the evidence is of but slight weight or importance upon that point, the trial judge might well be justified in excluding it entirely, because of its prejudicial and dangerous character as to other points. . . . This would emphatically be true where there is good reason for believing that the real object for which the evidence is offered is not to prove the point for which it is ostensibly offered and is competent, but is to get before the jury declarations as to other points, to prove which the evidence is incompetent. The same thing would be true as to the introduction of repeated declarations, when once the point for which they are competent has been amply shown. It may also be that the portions of the declaration which there is danger may be misused by the jury are not so interwoven with the balance of the declaration but that they can be disassociated from it without impairing the meaning or effect of the declaration for the purpose for which it is admissible. In such a case, evidence of such portions of the declaration may be excluded on proper objection, when offered, if there is opportunity for such objection, or, if there is not, may be stricken out on motion

subsequently. The . . . opponent of such evidence, so likely to be misused against him, is entitled to such protection against its misuse as can reasonably be given him without impairing the ability of the other party to prove his case, or depriving him of the use of competent evidence reasonably necessary for that purpose.''

In the instant case, as shown by colloquies outside the presence of the jury, the trial judge and prosecuting attorney were aware of the foregoing problems and heeded the following admonitions: ''[T]he accusatory statement should be held inadmissible by the trial judge in the first instance . . . if it appears that a great mass of extraneous hearsay matter will be placed before the jury through this device.'' (*People* v. *Simmons* (1946), 28 Cal.2d 699, 719 [11] [172 P.2d 18].) Also in initially determining the admissibility of evidence of offenses other than the crime for which defendant is on trial, the judge should keep in mind that such evidence ''should not be admitted simply on the showing that some part of that transaction is relevant to the case. The possibility of severing relevant from irrelevant [or unduly prejudicial] portions should, in every case, be considered, thereby protecting the defendant against reference to other crimes where it has no tendency to establish facts pertinent to the proof of the crime charged.'' (*People* v. *Dabb* (1948), 32 Cal.2d 491, 500 [11] [197 P.2d 1], which concerns confessions of other offenses but likewise applies to accusatory statements.)

By limiting Mrs. Hubbard's testimony the People properly kept from the jury the following matters: Her ''statement'' of which defendant sought retraction was an accusation of violations of section 288 by defendant against her own small daughter in 1946. As Mrs. Hubbard knew, at that time defendant's then wife (not the present Mrs. Burton) also had accused him of such offenses against her little girl. (The precise disposition of these matters does not appear in the record, but defense counsel said in chambers that the district attorney of the county in which these complaints were made ''threw it out within about 24 hours.'')

We find no abuse of discretion in the determination that the probative value of Mrs. Hubbard's testimony, as limited to exclude the just mentioned evidence suggesting prior specific misconduct, exceeded its prejudicial effect. (*People* v. *McCaughan* (1957), 49 Cal.2d 409, 421-422 [18] [317 P.2d 974].) That the jury might, from such testimony,

infer facts which the People could not have proved directly, is a risk of the sort which must be and is borne in the trial of many cases. This is true similarly of the circumstance, which defense counsel urged to the trial judge as a ground for rejecting all testimony of Mrs. Hubbard, that "Either he [defendant] must sit silent and allow it to stand as an accusation against him or he can explain what was the background to this conversation. The minute he does that, he opens the door for all this other to come in and hang himself." (See discussion of a similiar problem in *People* v. *Adamson* (1946), 27 Cal.2d 478, 493-494 [20] [165 P.2d 3].)

Defendant further urges that the trial judge erred in ruling that cross-examination of Mrs. Hubbard as to her presence at the time and place of the alleged commission of the subject crimes was "irrelevant." The ruling was correct. The bases of Mrs. Hubbard's expressed opinions that she had no doubt of defendant's guilt of the present offenses and that unless he received "help" he was "headed, to the gas chamber," were not proper subjects of inquiry because those statements were not received to show that Mrs. Hubbard had the factual knowledge or expertise necessary to form those opinions, but rather to show defendant's reactions to her accusations. (*People* v. *Davis* (1954), *supra,* 43 Cal.2d 661, 670 [6].)

In this regard defendant was protected, insofar as was reasonably possible, by the giving of the approved instruction that "Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only to explain the conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement." (CALJIC No. 30, 1958 ed.; *People* v. *Davis* (1957), 48 Cal.2d 241, 251 [309 P.2d 1].)

Defendant complains of the trial judge's question, "What was it he wanted you to retract?" Of course the judge should not have asked a question which he knew called for objectionable testimony, and his further statement "I thought maybe they would welcome that" appears to be, as defendant says, inexplicable in view of the facts that the prosecuting attorney had been careful not to present the objectionable matter to the jury and defense counsel had argued at length that all testimony of this witness should be excluded. But because of the alertness of counsel for both sides the question was not answered. And we assume that the jury followed the judge's proper instruction that "as to any question to which

an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection." (CALJIC No. 6, 1958 ed.; see *People* v. *Brown* (1958), 49 Cal.2d 577, 590 [320 P.2d 5].)

 Defendant urges that the evidence of W's complaint to her mother on the morning of August 16, shortly after the alleged offenses, was inadmissible and so prejudicial that the matter can be considered on appeal even though no objection thereto was made in the trial court. In a case such as the present, where the nonconsenting victim of a sex offense testifies to its commission, the theory of admissibility of evidence of a complaint which is consistent with her testimony and which is not a spontaneous declaration which might be excepted from the hearsay objection is this: It is natural to expect that the victim of such a crime would complain of it, and the prosecution can show the fact of complaint to forestall the assumption that none was made and that therefore the offense did not occur. (*People* v. *Wilmot* (1903), 139 Cal. 103, 105 [72 P. 838] ; 4 Wigmore, Evidence [3d ed., 1940], § 1135.) Defendant relies on decisions that in this situation the People can show only the bare "fact of complaint" and that proof that the complaining declaration included the nature of the offense or the name of the defendant is objectionable hearsay. The cases in this regard are not in harmony.

 We agree with the reasoning of those cases which point out that testimony to the bare fact that the victim "made a complaint" as to an unspecified subject matter on its face would be meaningless; if the complaint did not relate to the alleged offense and (assuming that the victim identified the perpetrator) to the defendant, it would be immaterial to the proof of the People's case; but from the mere receipt of such evidence offered by the prosecution it seems inevitable that the jury would infer that the complaint was that the defendant committed the offense. *We therefore accept the view that although details cannot be recounted, it can be shown by the People "that the complaint related to the matter being inquired into, and not a complaint wholly foreign to the subject"* (*People* v. *Swist* (1902), *supra*, 136 Cal. 520, 524); *that is, the alleged victim's statement of the nature of the offense and the identity of the asserted offender, without details, is proper.* (E.g., *People* v. *Adams* (1928), 92 Cal.App. 6, 16 [4] [267 P. 906] ["that appellant had 'ruined her' "] ; *People* v. *Porter* (1920), 48 Cal.App. 237, 241-242 [2] [191 P. 951] ; *People* v. *Lopez* (1917), 33 Cal.App. 530, 534 [165

P. 722] ["that she had had sexual intercourse with her father"]; see Fricke, California Criminal Evidence [4th ed., 1957], pp. 54-55.) For clarification of the law in the area delimited by our above italicized holding, we overrule or disapprove contrary implications or holdings of the following cases: *People* v. *Huston* (1943), 21 Cal.2d 690, 694 [4] [134 P.2d 758]; *People* v. *Adams* (1939), *supra,* 14 Cal.2d 154, 158-159; *People* v. *Wilmot* (1903), *supra,* 139 Cal. 103, 106-107; *People* v. *Swist* (1902), *supra,* 136 Cal. 520, 523; *People* v. *Lambert* (1898), 120 Cal. 170, 172 [52 P. 307]; *People* v. *Mayes* (1885), 66 Cal. 597, 599 [6 P. 691, 56 Am.Rep. 119]; *People* v. *Watrous* (1935), 7 Cal.App.2d 7, 13 [4] [45 P.2d 380]; *People* v. *O'Bryan* (1933), 132 Cal.App. 496, 504 [23 P.2d 94]; *People* v. *Branch* (1926), 77 Cal.App. 384, 388 [246 P. 811]; *People* v. *Avila* (1920), 50 Cal.App. 228, 230 [2] [194 P. 768]; *People* v. *Porter* (1920), *supra,* 48 Cal.App. 237, 241 [2]; *People* v. *Prietz* (1917), 32 Cal.App. 727, 728 [164 P. 13]; *People* v. *Fernandez* (1906), 4 Cal.App. 314, 319 [87 P. 1112]. We emphasize that the holdings or implications of the above listed cases are overruled or disapproved only to the extent that they may be contrary to our holding today.

Defendant is mistaken in his assertion that the subject complaint of W contained inadmissible details. As hereinabove related it was simply a statement of the asserted fact without any further description. He asserts also that the language of the complaint was prejudicially "inflammatory." This may be, but it was not therefore inadmissible. It appears from other testimony concerning the manner of speech of the child's mother and stepfather that this might well be W's natural mode of describing such an event.

Defendant urges further that the trial judge erred to his prejudice in denying his motion to strike the following testimony of Katherine Blackstone: "Q. Approximately two years ago at your home in Oakview did you have a conversation with Goldie Fay Burton [defendant's wife] in which she told you that [W] had complained to her that Joe Burton had molested [W]? A. No, she didn't say he molested her. She said the child said he had put his hand on her—on his body.

"Q. Had her put her hand on his body? A. Yes."

Miss Blackstone was a rebuttal witness. Her testimony was received to impeach (contradict) the following testimony of Mrs. Burton, adduced by the People without objection on cross-examination after she had testified as a witness for defendant: "Q. Isn't it true that approximately two years

ago while you were living up near Miss Blackstone's . . . you told Miss Blackstone that [W] had complained to you that Joe Burton had molested her? . . . A. That is not true.''

The question here is whether Miss Blackstone's testimony is vulnerable to the objection that it is not ''within the proper scope of impeachment to show that a witness has given false testimony as to a matter which could not be proved independently in the case.'' (*People* v. *Wells* (1949), 33 Cal.2d 330, 340 [7] [202 P.2d 53].) Obviously the testimony of Miss Blackstone, if offered as part of the People's case in chief, would have been objectionable hearsay. (See *People* v. *Hubbell* (1942), 54 Cal.App.2d 49, 55-56 [1] [128 P.2d 579].) But a witness can also be cross-examined, and rebuttal evidence impeaching his answers on cross-examination can be introduced, as to matters affecting his credibility. (*Laird* v. *T. W. Mather, Inc.* (1958), 51 Cal.2d 210, 219 [9, 10] [331 P.2d 617]; *Barkly* v. *Copeland* (1890), 86 Cal. 483, 486 [25 P. 1, 405]; *People* v. *Chin Mook Sow* (1877), 51 Cal. 597, 600.)

 Here the jury were confronted with what appear to be close questions concerning the credence to be given the respective evidence of W, Mrs. Burton, and defendant. Particularly, they had before them W's testimony that defendant had been guilty of prior lewd conduct toward her; evidence that W had previously testified that her mother knew of such conduct; Mrs. Brownen's testimony that Mrs. Burton had accused defendant of prior misconduct and that he did not deny it; defendant's statement to the deputy sheriff that Mrs. Burton and W had been making false accusations for more than a year; and Mrs. Burton's testimony that she had no knowledge and W had made no complaint of lewd conduct prior to August 16. In these circumstances it was proper to admit Miss Blackstone's impeaching testimony for what it was worth in determining the credence to be given Mrs. Burton. (See *People* v. *Atchley* (1959), 53 Cal.2d 160, 172-173 [12] [346 P.2d 764]; *People* v. *Wissenfeld* (1951), 36 Cal.2d 758, 765-766 [6a-6b] [227 P.2d 833].)

 The foregoing considerations make proper also the following question asked of Mrs. Burton on cross-examination by the prosecuting attorney over defendant's objection: ''Now, isn't it true that when [W] made her complaint to you she told you about a time Joe had molested her when all of you were in the bed together and you were drunk?'' (To this question the witness answered, ''No. . . . [The juvenile

officer] told me that right in front of Capt. Stephens and I denied it.'')

 Cross-examination of Mrs. Burton as to threats and acts of violence against her by defendant on and after the morning of August 16 was proper. The jury might infer consciousness of guilt from attempts of defendant to intimidate the witness (see the conversation of the Burtons related by Mrs. Brownen, *supra*, p. 338). Also they might infer either that the abuse of defendant caused her testimony to be unduly favorable to defendant because she feared him, or that it caused a hostile bias against him.

 However, the following question, asked of Mrs. Burton for the purported purpose of ''testing recollection'' and answered negatively, went beyond the proper scope of cross-examination: ''Isn't it true that [on the morning of August 16] you asked Harold [defendant's teen-aged son] where he had been, that he said he had been to call Grandma and you said, 'Yes, get that God damned old bitch involved again'?'' Any purpose of legitimate inquiry as to the witness' memory was overcome by the prejudicially immaterial implications in the question. Nevertheless, we cannot say that, in the light of the whole record, the error in failing to sustain defendant's objection to the inquiry resulted in a miscarriage of justice.

 *Claimed Failure to Prevent the Jury's Premature Discussion of the Case.* The jury were admonished on appropriate occasions, as required by Penal Code, section 1122, ''that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them.'' On the occasion of a noon adjournment the judge added, ''I noticed some of the jury right in the jury box communicating with one another. I don't know whether you are talking about the case or not, but I assume that you are not.'' Defendant at the time of this incident did nothing. He now urges that the trial judge of his own motion should have interrogated the jurors to ascertain whether their conversation had been improper. In the absence of a timely suggestion to this effect, and the want of any showing of prejudice, defendant cannot complain of this matter.

*Asserted Coercion of Verdicts of Guilty.* The jury first retired to deliberate at 12:51 p. m. At 5:25 p. m. at the request of the judge they returned into court and the following occurred:

''The Court: . . . Have you arrived at a verdict?

"THE FOREMAN: No, sir, we have not.

"THE COURT: I want to know how you stand just numerically, . . . not which one you are for or against. . . .

"THE FOREMAN: . . . 8 to 4. . . .

"THE COURT: Well, you think there is a chance of your arriving at a verdict?

"THE FOREMAN: I think . . . we can come to a decision.

"THE COURT: All right. It seems to me you ought to be able to arrive at a verdict. You may retire again.

" (Whereupon the jury retired for further deliberations.)

" (Whereupon at 6:15 the jury returned for further proceedings.)

"THE COURT: Ladies and gentlemen of the jury, have you arrived at a verdict?

"THE FOREMAN: No, sir, we have not. We are a hung jury.

"THE COURT: How do you stand numerically now?

"THE FOREMAN: . . . 9 to 3. . . .

"THE COURT: Do you still think that there is a chance of arriving at a verdict?

"THE FOREMAN: No, sir, I do not.

"THE COURT: How many members of this jury think that there is a chance of arriving at a verdict? Hold up your hands. [The record does not show what the jurors did in this regard.] . . . Well, how long have we been trying this case, four days?

"MR. DEEM: Yes, your Honor.

"MR. WAITE: If the Court please, if the jury feels they are hung and they can't arrive at a verdict, I don't think it is necessary to punish them.

"MR. DEEM: Well, if your Honor please, I am not in favor of punishing the jury. However, I think it would be of the public interest, if there is any chance that they can arrive at a verdict, that we have some additional deliberation.

"THE COURT: The trial has lasted four days. It's not very fair to the County of Ventura for the Court to discharge them without very careful consideration.

"MR. WAITE: Well, if they say that they are hopelessly hung. That is what I understood.

"THE COURT: I have known them to say they were hung many a time and still bring in a verdict one way or another. Mr. Bailiff, take this jury to dinner. When you come back from dinner, you can deliberate further.

" (Whereupon at 9:30 p. m. the jury returned to court for further proceedings.)

"The Court: Ladies and gentlemen of the jury, have you arrived at a verdict?

"The Foreman: Yes, sir, we have."

The verdicts of guilty were read and the jury were polled. The court said, "It is unanimous as to both Counts. Well, ladies and gentlemen of the jury, you had a rather difficult case, apparently. It took you a long time to arrive at a verdict. I had an idea you would arrive at a verdict very promptly, but the fact that you took so long shows that you were a very careful and conscientious jury and I am satisfied that you did the best you could to decide the case according to the law and the evidence, and you decided the case just the way—I couldn't see how you could decide it any other way, possibly, except the way you did decide it. Only why it took so long will always be a mystery to me under the evidence that was adduced in this case.

"Nevertheless, I think you are to be commended for being careful and I am satisfied that you were an unusually good and conscientious jury.

"The People of the State of California are very grateful to you for your very valuable services, as are the people of Ventura County and this Court. Thank you very much, indeed, ladies and gentlemen, for your careful and conscientious attention to this Court."

■■■ Whether statements of a trial judge amount to coercion of a verdict is peculiarly dependent upon the facts of each case. ■■■ Here the judge was careful to let the jurors know that they should not inform him how many had voted for conviction and how many for acquittal, nor did they suggest to the judge their standing in this regard. Therefore, his statements that "It seems to me you ought to be able to arrive at a verdict" and that the jury should not be discharged "without very careful consideration" cannot properly be understood to suggest that he was urging any particular verdict.

■■■ On defendant's behalf it is argued that, especially because it had been disclosed to the jurors in the course of trial that this case had been tried previously, the judge's statement, "It's *not very fair to the County of Ventura* for the Court to discharge them without very careful consideration" (italics added), could lead the jury to believe that if they did not agree defendant would be tried again with further expense to the county, and that the comment implied that the unfair-

ness in discharging the jury would be to the county only, not to the defendant.

We can understand that jurors might consider in some contexts that a reference to fairness to the county would suggest concern for the government in its role as prosecutor. But this statement was followed by the further comment, "I have known them to say they were hung many a time and still bring in a verdict *one way or another*" (italics added), which reasonably, we should presume (particularly in the light of other instructions), indicated to the jurors that the judge was expressing merely desire that they reach agreement, not that their verdict should be for either party. And it has been held that "In reminding the jury of the expense of the trial, and the desirability to them as taxpayers of avoiding a repetition of this expense, [the judge] was saying no more to them than they as taxpayers and intelligent men must be presumed to have known without being told by the court." (*People* v. *Miles* (1904), 143 Cal. 636, 639 [77 P. 666].)

 Defendant also calls particular attention to the remarks of the judge, after the jury had returned their verdicts, which show that he thought that their conclusion was correct and did not understand why they had not reached it sooner. But we find nothing in the record to suggest that the judge communicated this opinion to the jury while the case was still before them.

For the reasons above stated the judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.