Filed 6/20/16  P. v. Andrades CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN R. ANDRADES,<br><br>    Defendant and Appellant. | B263046<br><br>(Los Angeles County<br>Super. Ct. No. GA091839) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Juan R. Andrades appeals from his judgment of conviction for burglary (Pen. Code, § 459) and assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)).[1]  The victim in this case was appellant's sister, Iris Mendez (Mendez). Appellant asserts instructional error and that insufficient evidence supported his conviction on both counts.  We affirm.

### FACTS AND PROCEDURE

The case against appellant arises from events at his family home on December 25, 2013.  Police were called to the home three times on December 25.  Appellant lived in the home with his sister Mendez, her husband Jorge Alberto, appellant's girlfriend "Gina," and other family members.  On December 24, they had a family gathering, which also included appellant's mother Ana Mendez (Ana).  Many of them were drinking alcohol.

Mendez started drinking at approximately 5:00 p.m. on December 24 and only slept for a few hours around 5:00 a.m. on December 25.  She awoke around 7:00 a.m. Mendez was intoxicated that morning.  She probably drank more than 12 beers between 5:00 p.m. and 5:00 a.m., and she drank two beers mixed with tomato juice after waking up.

Mendez called 911 at approximately 8:00 a.m. on December 25 because appellant and Gina were arguing, and appellant was so upset that Mendez thought he would hit Gina.  Appellant became upset with Mendez for calling 911 because he said Gina had problems with the police.  The Los Angeles County Sheriff's Deputies arrived and stayed for 10 to 15 minutes but did not write a report because "it was just an argument" or family disturbance, and they did not think a crime had occurred.  After they left, Mendez told appellant she did not want Gina living in the house anymore.

---

[1]  Further undesignated statutory references are to the Penal Code.

2

Mendez did not know who called the sheriff's deputies the second time, but she, appellant, and Gina were arguing.  The deputies arrived this time at approximately 10:00 a.m.  Mendez had taken Gina's things out of the house and put them on the patio.

The sheriff's deputies arrived the third time around 11:00 a.m.  Appellant was still angry with Mendez and was pushing Gina to fight her.  Mendez had locked herself in her bedroom with Alberto and their five-year-old son.  Appellant and Gina broke open the bedroom door.  Mendez told Alberto to take their son, get out, and call the sheriff's deputies.  Gina took Mendez's phone out of her hand and threw it.  Gina hit her with an empty beer bottle once on the forehead.

Mendez proffered differing accounts of what happened next during the assault.  The jury heard evidence of each account.  The day after the incident, she told sheriff's deputies that appellant hit her in the face with his fist 15 to 17 times.  Gina held Mendez down while appellant punched her.  She lost consciousness for an unknown amount of time.  Appellant said he was going to kill her "next time."  Alberto also told deputies that appellant struck Mendez in the face; Alberto observed this before he ran out of the room with his son.  At the hospital on the day of the incident, Mendez told medical personnel that appellant caused her injuries.

At the preliminary hearing in this matter, Mendez testified that appellant hit her in the face with his fist approximately 10 times and she lost consciousness, and when she awoke he was still punching her in the face.  Gina held Mendez down.  Appellant told her not to call the police again, and "this" was how she was "going to learn" not to call.  He also said the next time he was going to kill her.  Mendez ran to the neighbor's house because appellant would not stop beating her.  After the preliminary hearing broke for lunch and Mendez recommenced testifying, she said she wanted "to withdraw everything."  Mendez acknowledged that she had spoken with her (and appellant's) mother and sister about the case during the lunch break.  The court ordered her to continue answering questions, and she continued to respond that appellant hit her.

It was not until trial that Mendez denied appellant hit her.  At trial, she testified that she fainted after Gina hit her with the beer bottle.  When she regained consciousness,

3

Gina was hitting Mendez with her fist. Appellant only pushed Mendez. The beating stopped when appellant told Gina the sheriff's deputies were outside. Appellant was angry and hurled insults and other "bad words" at Mendez. After the incident, Mendez's mother was upset with her for calling the sheriff's deputies and "because the boys have always been her favorites."

Mendez explained that she previously said appellant hit her because she blamed him for bringing Gina into the house and was resentful. She insisted that she was being truthful in her trial testimony.

The prosecutor played Alberto's 911 call for the jury (the third 911 call of the day). He was calling from the neighbor's house. In it, he told the operator that appellant was beating Mendez. At trial, Alberto testified he did not see exactly who beat her because he was not present.

The assault caused Mendez to bleed from her ear. She also suffered swelling in her face for approximately three days, bruising on her chest, and a black eye that cleared in one to two weeks. The hospital treated her with pain medication.

Sheriff's deputies took photographs of appellant's hands the day after the assault. He had cuts on his knuckles, fingers, and wrist, and some redness or bruising on one hand.

The defense's medical expert, Dr. Ryan O'Connor, described Mendez's injuries as swelling and a hematoma to the left side of her forehead and around her eye. (Hematoma is a collection of blood under the skin.) Her blood test at the hospital (collected at 12:48 p.m.) indicated a blood alcohol level of 0.183, over twice the legal limit for driving. The examining physician's notes indicate the physician had difficulty obtaining a history from Mendez because she did not have a good recollection of events. Her diagnosis was head injury, ecchymosis (bruising), contusion, and alcohol intoxication. Dr. O'Connor rated her injuries as minor to moderate.

Ana, appellant's mother, testified in his defense. She saw Gina and Mendez get into a fight on the day in question. They pushed and hit each other, and Mendez fell. She never saw appellant fight with Mendez. At some point after that, Ana left the house

4

because it was painful to see her family fighting. She saw the sheriff's deputies come to the house only once. Ana denied telling Mendez to "withdraw the charges" during the lunch break at the preliminary hearing. She simply advised Mendez not to lie.

The information charged appellant with first degree burglary (count one), assault by means likely to cause great bodily injury (count two), and criminal threats (count three). As to count two, it alleged appellant personally inflicted great bodily injury on Mendez within the meaning of section 12022.7, subdivision (a). The jury convicted appellant of first degree burglary and assault by means likely to produce great bodily injury, but found not true the allegation that appellant had personally inflicted great bodily injury. The jury found him not guilty of criminal threats.

The court sentenced appellant to a total of six years in state prison. The court imposed six years in prison on both counts, but stayed the sentence on count two pursuant to section 654.

## DISCUSSION

### 1. Appellant Fails to Demonstrate Instructional Error

Appellant contends the court erred because it failed to instruct the jury that simple assault could not support the burglary charge. There is no merit to this contention.

We apply the de novo standard of review to a charge of instructional error. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.) In pertinent part, a person who enters a room "with intent to commit grand or petit larceny or *any felony* is guilty of burglary." (§ 459, italics added.) The court instructed the jury on the elements of burglary with pattern jury instruction CALCRIM No. 1700 and identified the underlying felonies that could support a burglary charge in this case: "The defendant is charged in Count One with burglary in violation of Penal Code section 459. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant entered a house or room within a house; [¶] AND [¶] 2. When he entered the house or room, he intended to commit the crime of (i) Assault by Means Likely to Produce Great Bodily Injury or (ii) Criminal Threats. [¶] . . . [¶] To decide whether the defendant intended to commit the crimes of Assault by Means Likely to Produce Great Bodily

5

Injury or Criminal Threats, please refer to the separate instructions that I will give you on those crimes." The court instructed the jury on these underlying felonies, as well as the lesser included offense of simple assault.

The jury sent a question to the court during deliberations asking: "Does the burglary count require great bodily injury or can the simple assault charge support the burglary charge?" The court's response stated: "Intent to commit Simple Assault cannot satisfy the second element of the crime of Burglary charged in Count One. Please refer to instruction '1700. Burglary (Penal Code § 459).'"

There was no error here. The court properly instructed the jury that burglary required the intent to commit one of the two felonies, which is consistent with the statutory definition of burglary. Appellant cites no authority disproving of CALCRIM No. 1700, a correct statement of the law. Nor does he cite any authority showing the court was required to instruct that an intent to commit a misdemeanor did *not* satisfy the second element of burglary. The court has a constitutional duty to instruct on every material element of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 480)—not every possible negative implication of the material elements. In any event, when the jurors asked about the issue, the court correctly replied that simple assault could not support the burglary charge. Appellant asserts the jury's question "irrefragably shows that appellant's jury was ready to convict appellant of the lesser included misdemeanor charge until it received the trial court's response that its decision had to be based on general intent, which was an incorrect statement of law in response to the question asked." The court's response, quoted verbatim above, says nothing about the jury basing its decision on general intent.

## 2. *Substantial Evidence Supported Appellant's Conviction*

Appellant claims insufficient evidence supported his conviction for burglary and assault by means likely to produce great bodily injury. We disagree.

We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the

6

defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We "resolve[] neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Even if we might have made different factual findings or drawn different inferences than the jury, we do not reverse the judgment if the circumstances reasonably justify the factual findings of the jury. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

Although appellant insists that he is not asking this court to reweigh conflicting evidence, that is exactly what he is doing, if not in so many words. He suggests Mendez's statements could not support the judgment because her version of events differed every time she recounted it. Moreover, he asserts, she was intoxicated on the day in question, she could not recollect what happened when questioned at the hospital, and she stated she lied to the deputies and at the preliminary hearing. This makes her testimony unreliable as a matter of law, according to appellant. Along the same lines, he contends that Alberto's testimony was unreliable because he was also drinking at the party the night before and only saw or heard part of the events. But resolving credibility issues is the sole province of the jury. We may reject a witness's statements only when they either present a physical impossibility, or their falsity is apparent without resorting to inferences or deductions. (*People v. Barnes* (1986) 42 Cal.3d 284, 306.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment . . . ." (*People v. Huston* (1943) 21 Cal.2d 690, 693, overruled on another ground by *People v. Burton* (1961) 55 Cal.2d 328, 351-352.) The jury learned of the circumstances that might render the testimony of these witnesses unreliable, and it heard Mendez's trial statements and evidence of her prior inconsistent statements. The jury chose to believe her prior statements and Alberto's statements about appellant punching her. We may not disturb that determination on appeal.

Appellant further argues there was insufficient evidence of felony assault, as opposed to simple (misdemeanor) assault, because there was no evidence that Mendez suffered great bodily injury. Appellant maintains that if he punched Mendez in the face

7

10 or 15 times, Mendez would have suffered more than just bruises and swelling. Moreover, appellant points out, the jury found not true the allegation that he personally inflicted great bodily injury. But the not true finding on the special allegation was not necessarily inconsistent with his conviction for felony assault. Assault by means of force likely to produce great bodily injury does not require *actual* injury. "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.] That the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury' is well established." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) "It is not an essential of the crime that an intent severely to injure by the use of force be proved. [Citation.] Neither is it required that the injuries received be serious. [Citation.] . . . [Citation.] One may be guilty of this crime although the attack is made with the hands. [Citations.] . . . [Citation.] The guilt of appellant is not to be adjudged solely by the extent of the scratches and abrasions he left upon his victim, but by the jury's determination of whether the means used was likely to produce great bodily harm . . . ." (*People v. Schmidt* (1944) 66 Cal.App.2d 253, 256.) "'Whether a fist would be likely to produce such injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied.'" (*People v. Kinman* (1955) 134 Cal.App.2d 419, 422 (*Kinman*).)

*Kinman* is instructive. In that case, the defendant delivered a single blow and kick to the victim, resulting in four loose teeth, two black eyes, two cuts, and a large bruise. (*Kinman, supra*, 134 Cal.App.2d at p. 421.) The court held the jury could reasonably find force likely to produce great bodily injury from this evidence and the fact that the defendant was male and much larger than the female victim. (*Id.* at pp. 420-421.) Here, Mendez was bleeding from her ear after the attack, had a black eye and other bruising, and swelling for days afterward. Additionally, Gina was holding Mendez down while appellant, who had cuts and bruising on his hands, pummeled her. The jury could reasonably find force likely to produce great bodily injury from Mendez's injuries and

8

the fact that she was restrained while appellant delivered multiple blows to her face with his fist.

Lastly, appellant claims the sheriff's deputies conducted a "sloppy investigation." He highlights things such as: (1) an admitted error on the police report in which the deputy said they entered through the locked front door, but it was actually unlocked; (2) deputies thought Mendez did not appear intoxicated and did not smell alcohol on her; (3) deputies did not order a blood alcohol test for appellant; (4) they had the chance to photograph Mendez's bedroom door the day of the incident, but did not do so until the following day; and (5) one deputy who interviewed Alberto did not document that conversation in her police report. Even if it were true that the deputies conducted a sloppy investigation, appellant does not show why this amounts to a lack of substantial evidence. The jury could consider these things in deciding what weight to give the deputies' testimony. Purported sloppiness does not mean the jury could not rely on their testimony as a matter of law.

## DISPOSITION

The judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

9